## UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID and MARGARET DOWNS** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **BOROUGH OF JENKINTOWN, ET AL.** | : | **NO. 18-CV-4529** |
| | : | |
| **Defendants** | : | |
| | : | |

### PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION AND/OR TO ALTER/AMEND THE COURT'S MAY 22, 2020 ORDER AND DECISION PARTIALLY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.      BACKGROUND

On May 22, 2020, the Clerk entered the Court's Order and Opinion partially granting

Defendants' Motion For Summary Judgment.  (A copy of the Opinion is appended hereto as

Exhibit "A".)  Plaintiff believes the Court made errors in deciding facts and applying the law to

Plaintiff's claims for First Amendment Retaliation against Defendants, Borough of Jenkintown,

Deborah Pancoe and Richard Bunker.  Plaintiff requests that the Court alter its judgment as to

Plaintiff's First Amendment Retaliation claims against the aforesaid Defendants and vacate its

decision to grant summary judgment.

### Request For Oral Argument

Plaintiffs respectfully request that the Court list this motion to be heard for oral argument.

## II.  STANDARD FOR RECONSIDERATION

Pursuant to Rule 59(e), a litigant has 28 days from the entry of an order granting summary

judgment to file a motion for reconsideration and/or motion to alter judgment.  Fed. R. Civ. P.

59(e) and see <u>Tillio v. Rodriguz</u>, 481 Fed. Appx. 36, 37 (3d Cir. 2012).

1

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). In this motion, Plaintiffs ask the Court to reconsider the May 22, 2020 Order dismissing of Defendants, Deborah Pancoe, Richard Bunker and Borough of Jenkintown.

Third Circuit Model Jury Instruction 1.6 addresses "direct" and "circumstantial" evidence and states in part:

> You should consider both kinds of evidence that are presented to you. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

(Third Circuit Model Jury Instruction 1.6 - Last Updated in October, 2017)

A review of the Court's Opinion appears to put great emphasis on direct evidence and disregards the substantial amount of circumstantial evidence that Plaintiffs raised in their response to Defendants' Motion For Summary Judgment. It is often difficult to prove intent through direct evidence in civil rights cases and, therefore, parties will rely upon circumstantial evidence. Often, circumstantial evidence is more persuasive than direct evidence. Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d 655, 670-71(3d Cir. 2002); Howard v. Blalock Elec. Serv., 742 F. Supp. 2d 681, 701 (W.D. Pa. 2010) *citing to* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147-149 (2000) *and* Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003).

## III. ARGUMENT

### A. THE COURT FAILED TO DETERMINE THE FACTS IN A LIGHT MOST FAVORABLE TO PLAINTIFFS

The Court acknowledges in the Opinion that it "is required to examine the evidence of record in the light most favorable to the party opposing summary judgment and resolve all reasonable inferences in that party's favor." Opinion p. 11 *citing* <u>Wishkin v. Potter</u>, 476 F.3d 180, 184 (3d Cir. 2007). Another well know standard when deciding a motion for summary judgment is that the Court is not permitted to make credibility determinations. "At the summary judgment stage of proceedings, courts do not weigh the evidence or make credibility determinations but, instead, leave that task to the fact finder at a later trial if the court denies summary judgment." <u>Halsey v. Pfeiffer</u>, 750 F.3d 273, 286 (3d Cir. 2014). As is set forth below: 1) the Court's fact section overlooked many of Plaintiff's factual allegations; 2) drew inferences in favor of Defendant instead of Plaintiff; and, 3) made credibility determinations in favor of Defendant.

**1. The Court Failed To Determine, For Purposes Of Summary Judgment, That Plaintiffs Did Not Operate A Business**

Plaintiffs both testified that they did not operate any impact business out of their home. Both testified that they did not operate, at any time, a landscaping business. (Ex. "2" ¶ 10; Ex. "3" ¶ 10, Certifications of Plaintiffs)[1] This fact is important since one of the key issues in this case is whether Defendants legitimately believed that Plaintiffs operated an impact business. Kilkenny admitted that he jogged by Plaintiffs' house every day and never saw Plaintiffs operating any business. (N.T. Kilkenny, p. 22:8-16, Ex. "23") Locke admitted that Plaintiffs were not operating a business in November and December of 2017, the time that the Notice Of Violation was issued. (N.T. Locke, p. 73:11-17, Ex. "7") See also the Certifications of neighbors

---

[1]Unless otherwise noted, all citations to record are contained in the Exhibits attached to Plaintiffs' Response to Defendants' Motion For Summary Judgment.

that live in close proximity to Plaintiffs.  (Certifications of Gusoff, Harte and Gee, Ex. "4")

Defendants did not offer any legitimate evidence that would demonstrate that Plaintiff's operated

a business.  No business license or any other indices that David or Margaret Downs operated a

business were offered because none existed.

The Court seemed to give weight to the Glasses complaint to the Borough that Plaintiffs

were operating an impact business (See p. 5 of Opinion, Ex. "A") to lend some kind of credibility

to the Borough actions to issue notices of violation and the subsequent citations against

Plaintiffs. For purposes of summary judgment, the Court should have found that the Glasses

complaints were bogus and retaliatory because Plaintiff's had, rightly, complained that the

Glasses were operating an impact business and had also filed criminal complaints against Joseph

Glass.

While it may have seemed obvious to the Court that Plaintiffs did not operate an impact

business, acknowledging it was, and is, critical to understanding the remaining evidence.  The

Court did not do this.

On the other hand, the Court failed, to determine, for purposes of summary judgment, that

the Glasses were, in fact, operating an impact business.  The Court makes little mention of what

business the Glasses operate and does not identify the nature of Glasses business.  On page 3 of

the Opinion, the Court states: "Shortly after the Glasses moved in next door to the plaintiffs, the

Borough received at least 20 complaints, from the plaintiffs and other neighbors, that the Glasses

were operating an impact business, a construction business in violation of the Zoning Code for

the B-1 Residential District."  (Opinion, Ex. "A") The Court makes no further mention of the

details of the impact business being operated by the glasses. The Glasses operated a masonry business. (See Ex. "6") Plaintiff's Counterstatement of Facts states in part:

> 6. Ms. Durkin observed trucks coming and going from the Glass house, workers coming and going, equipment stored in the front yard and backyard, scaffolding, forms, cones, barricades and large wooden planks. (N.T. Durkin, p. 11-14, Ex. "8")

The Glasses openly and defiantly operated a concrete business from their yard and that was not permitted by the zoning code. The Court fails to acknowledge in the Opinion the crass difference in which Plaintiff's were treated compared to the Glasses and acknowledge the fact that Plaintiffs did not operate any business.

### 2. The Court Did Not Acknowledge And/Or Failed To Consider The Nature Of Plaintiff's Difficulties with The Glasses & The Failure of The Borough To Provide Protection - - Which Demonstrates Clear Animus Towards Plaintiffs

On paragraph 67 of Defendants' MSJ, they falsely accused Plaintiff of badgering Borough Council, Borough Management and the Jenkintown Police Department to take unethical and improper action. Though this fact is untrue, the Court may have viewed Plaintiffs as frivolous agitators acting without real reasons. In reality, Jenkintown had essentially abandoned their duty to protect Plaintiffs from the criminal acts of Joseph Glass. Defendant Bunker wrongly testified that the Jenkintown P.D. brought criminal charges against Joseph Glass claiming that the charges originated from the Jenkintown P.D. (N.T. Bunker, p. 40:14-25; 41:1-20, Ex. "16") In fact, the Jenkintown P.D. refused to charge Glass with a crime. (Ex. "2" ¶¶ 42-45 and "3" ¶¶ 40-43) Plaintiffs had to file a private criminal complaint with local Magistrate District Court. Plaintiff's criminal complaint was held over for trial and the prosecution of Joseph Glass was

assumed by the Montgomery County Prosecutor's Office and it was the Prosecutor's Office that took up the prosecution. (Id.)

At the criminal preliminary hearing, multiple counts of criminal harassment against Joseph Glass were bound over for trial in the Montgomery County Court of Common Pleas. Mr. Glass eventually plead guilty to two charges and was sentenced to 30 days in jail, placed on probation and fined. He violated his probation causing him to serve four months in jail. The Court eventually issued a "NO CONTACT" Order against Glass which prohibited him from having any contact with the Downses. (Id. and see Plea Agreement and Stay Away Order, Ex. "13")

Some of the comments made to Ms. Downs by Mr. Glass while Plaintiffs were outside of their home were: "hey, honey, let's go over there and bang the sh__ out of that lady [referring to Ms. Downs] that lives at that house, bang her up the a__ and f___ the hell out of her." (N.T. Dave Downs, p. 65-66, Ex. "27") Plaintiffs reported multiple instances of this conduct to the police and the police refused to take any action. (N.T. Dave Downs, p. 66, Ex. "27")

During the time that Plaintiffs were dealing with the criminal issues with the Glasses they, and their neighbors, were also dealing with zoning code violations (operating an impact business) being committed by the Glasses. The failure of the Jenkintown Police Department to enforce the criminal code against Joseph Glass correlates to retaliation that Plaintiff's experienced with Defendants in dealing with the zoning issues.

### 3. The Court Failed, For Purposes of Summary Judgment, To Identify The Admissions Contained In Locke's October 11, 2017 Memorandum To Council Which Would Have Led To The Obvious Inference That Locke Did Not Act Independently When Issuing The Notice Of Violation and Citation To Plaintiffs

The October 11, 2017 Memorandum is addressed to all council members, which includes Defendants Pancoe and Bunker. (Ex. "14" p. 1)  It addresses the false allegations made by the Glasses in October of 2016 that Plaintiffs were operating an impact business.  Locke states, based on his observations made during a site visit, that the Plaintiffs were not operating any business in October of 2016. (p. 1 of Ex. "14") In September of 2017, after Plaintiff has entered the race for Mayor of Jenkintown, the Glasses again made false allegations that Plaintiffs were operating an impact business.  About this complaint, Mr. Locke writes:

> After thorough review of all the documents provided, the Borough has concerns that these complaints, photographs, and videos depict the running of a landscape business. **A compliance letter has been drafted as well as a request for a meeting with David and Margaret Downs.**  A package containing this summary, compliance letter, and all supporting evidence has been submitted to the Borough Solicitor for legal review and guidance.

(See Ex. "14" p. 3)

In this Memorandum, Locke does a number of things that bind Defendants Borough, Pancoe and Bunker.  He speaks on behalf of the Borough as an authorized employee of the Borough.  He drafts a compliance letter and makes a request for a meeting with Plaintiffs, presumably to investigate whether Plaintiffs were operating a business.  As the record makes clear, this meeting never occurred. On November 21, 2017, Mr. Locke wrote a letter to the Downses which states in part: "After thorough review of all the documents provided, the Borough has concerns that these complaints, photographs and videos may be credible. . . . As discussed, the Borough is now looking to **discuss** these complaints after the Thanksgiving holiday with the Borough Solicitor(s) and I."  ( See the November 21, 2017 letter, Ex. "18".) This letter is clear evidence that the issue of whether Plaintiffs were operating an impact business

was still open for debate and suggests that a "discussion" regarding the allegations was supposed to take place. A meeting was scheduled for December 7, 2017 but no discussion or investigation ever took place. Instead, Kilkenny and Locke, personally handed the Notice of Violation to Plaintiffs at Borough Hall, which was directed by Pancoe. (N.T. Locke, p. 70-71, Ex. "7")

In doing this, Defendants deviated from the normal procedure of mailing Notices. (N.T. Locke, p. 70-71, Ex. "7") Kilkenny and Locke's deviation was done on purpose and was meant to intimidate Plaintiffs. Kilkenny does not work at Jenkintown's Borough Hall, he has a law office located on Swede Street in Norristown, Pa. He made it a point to come down to Borough Hall and personally serve the Notice on Plaintiffs. Kilkenny and Locke do not engage in these intimidating actions without the approval and consent of Pancoe.

Pancoe directed these actions. Locke testifies:

Q. Who handed the actual Notice of Violation to the Downs?

A. I think I did.

Q. Any reason you didn't mail it to them?

A. **I was asked not to. I was asked to hand it to them.**

Q. Who asked you to hand it to them?

A. Council. They wanted us to meet with them and not just mail them the violation; meet with them and give them the evidence.

Q. Is that Borough Council?

A. **The president, yeah. . . .**

The President of Borough Council was, and still is, Pancoe. (N.T. Locke, p. 70:19-25, 71:1-5, Ex. "7") This admission by Locke is an express admission of Pancoe's involvement in the

decision to issue the Notice of Violations to Plaintiffs. On Summary Judgment, the Court has to accept this as a fact in favor of Plaintiffs - - that is that Pancoe was a decision-maker with regard to the retaliatory actions. Incredibly, Pancoe testified that she did not instruct Locke to personally hand the notice to the Downses. She testified:

> Q. Do you know how it came to be or the process in which the Downs were provided the Notice of Violation?
>
> A. The process of the Downs' - -
>
> Q. How they received the notice. Let me ask it. Do you know how they received the Notice of Violation?
>
> A. I believe they got a letter.
>
> Q. Do you know how it was delivered?
>
> A. I do not.
>
> Q. Did you ever instruct Mr. Locke to hand deliver the Notice of Violation to the Downses?
>
> A. I did not instruct him of that.
> . . . . . . . .
> Q. Is the typical process to mail it?
>
> A. I think they go certified, yeah.
>
> Q. Through the mail?
>
> A. Yes.

(N.T. Pancoe, p. 108:25 - 109:1-11; 109:22-25, attached hereto as Ex. "B")

This conflict in testimony is material because it reveals the intention of the Defendants to humiliate and embarrass Plaintiffs. It also reveals a real issue of credibility on the part of Pancoe. A jury could easily find that Pancoe directed Locke (and Kilkenny) to set up a meeting,

based on the false pretense that Locke and Kilkenny would discuss whether Plaintiffs were in violation, but, instead, would really be an opportunity to personally hand deliver the Notice to Plaintiffs. The intention - - to humiliate and intimidate Plaintiffs and, quite frankly, flex their positions of power. The reason that Defendants decided to personally hand deliver the NOV to Plaintiffs on December 7, 2017 was very clear, to communicate to them "don't mess with us." The only reasonable conclusion to draw is that these actions were retaliatory.

The last paragraph of the Memorandum appears as though it was prepared by Defendants' lawyers, The Law Offices of Sean Kilkenny. It states:

> Under these conditions as the standard to determine if a business is being operated has been redefined due to recent legal cases and rulings, the Borough must make their determination based on the new, redefined standard. The Borough feels as though this may violate sections 181-10.G(1), 181-10.G(2) and 181-10.G(4) of the Jenkintown Borough Code relating to a no impact business. Specifically, the delivery or removal functions to or from the premises in excess of those normally associated with the residential use. (Ex. "14" p. 3)

Here, Locke falsely alleges that the standard to determine whether a "business is operating" has changed. He is doing this after he has consulted with Kilkenny's Office. Thus, the Borough's solicitor is advising Locke to state a false reason to justify their retaliatory efforts to cite Plaintiffs with violating the zoning code. Pancoe also did not know what the new standard was. (N.T. Pancoe, p. 146-147, Ex. "B"). For purposes of Summary Judgment, the Court must find that Plaintiffs were still not operating a business in 2017. For purposes of summary judgment, the Court should take judicial notice that when Kilkenny is advising the Borough, that he is consulting with the Borough's leaders, namely, Defendants Pancoe and Bunker as well as Locke. The fact that Locke is preparing the Memorandum and making decisions also clearly

demonstrates that he speaks and acts on behalf of the Borough. These facts and the reasonable inferences derived therefrom must be afforded to Plaintiffs in summary judgment practice. The Court erred by not making these summary judgment factual determinations.

### 4. The Court Overlooked Defendant Bunker's Admissions Of Animus Toward Plaintiffs & His Consent/Participation To The Decision To Falsely Cite Plaintiffs For Zoning Violations

Page 4 of the Opinion references some of Bunker's posts but did not include all of Bunker's participation in the decision to issue the Notice of Violation and Citation upon Plaintiffs. (Opinion at p. 4) Plaintiffs also identified the following posts in paragraph 25 of their Counterstatement of Facts, which states in part:

A sample of his posts includes the following: 1) that Ms. Downs would be a "disaster as a mayor"; 2) "She did badger council for months trying to get us to force zoning officers to unfairly and unevenly target a neighbor.": 3) **"What Downs wouldn't shut up about, and she still shows up at council meetings whining about, is that the police and zoning officials wouldn't help her persecute her neighbor as much as she wanted."; 4) "And she wanted council to lean on police and zoning to unevenly enforce law and code, to mess with her neighbor. It would be unethical for council to do so. Perhaps even illegal."**; 5) "Peggy Downs has cost the taxpayers tens of thousands of dollars on pointless right-to-know requests in her attempt to twist zoning law to run her neighbor out of town. . . And the only responsibility of the Mayor is to supervise the police, and her neighbor dispute involves the police at least weekly. Having her in charge of the police seems like a recipe for disaster to me." Bunker

admitted to writing the aforementioned posts. (N.T. Bunker, p. 91-95, Ex. "16"

and see Bunker's Posts attached hereto as Ex. "17")

As to the zoning and Citation issues, Bunker specifically stated:

-And I think that the citation against the Glass family, claiming he ran a business out of his house was silly, too.

-And I think the citation against the Downses is silly if it were in a vacuum. BUT **he who lives by the sword dies by the sword. And they pushed and pushed and pushed until they got the Glasses cited for basically the exact same thing. So how would it be fair not to cite them for the same thing when the Glasses complained?**

-If being a contrator or tradesperson and keeping tools in your garage and driving to work with them is a problem, then a TON of us in the borough are in trouble. I don't think it is. But again, the Downses set the standard with their complaint against the Glasses, and I guess **what's good for the goose is good for the gander.**

-and finally, it my understanding that if you get a zoning citation, all you have to do is write a letter saying "sorry I will stop" and the process is done. Why the Downses are turning this into a federal case is beyond me. . .

(See Bunker Posts, Ex. "17" and also attached hereto as Ex. "C")

Bunker's intentions are laid bare in this post which advocates that retaliation is an

acceptable reason to falsely issue a Notice of Violation and Citation to the Plaintiffs even though

they did not operate an impact business. The Downses did not use the sword, they used the pen

and the right to protest under the First Amendment. He further states that if Plaintiffs stopped

[operating their alleged business] **the process is done.** The Plaintiffs never even started an

impact business. To address the false allegations that they operated an impact business, on

multiple occasions, on their own and through their legal representatives, they communicated to

Locke, Kilkenny, Pancoe, Bunker and Council that they were not operating an impact business.

The process however did not stop - - it continued and the only reason is retaliation - - because Plaintiff's "pushed and pushed and pushed" in the exercise of their First Amendment rights.  By the way, it wasn't just Plaintiffs that complained about the Glasses but at least 20 other neighbors.

If the above is not enough to show Bunker's intentions, the following post says it all:

In my personal opinion, not having been closer to the whole stinking mess than I could possibly help, but having been subjected to hours of the Downses reading statements to council about enforcement that it is the police and zoning officials' responsibility to enforce, not council's.  I think that the Glasses citation was pretty weak, and that the Downses citation is pretty weak.  And I think that if the Downses hadn't pushed so hard neither of the citations would ever have been written.  And I think that once the Downses pushed hard enought to get the weak citation written against the Glasses, that they shouldn't act so stunned that the borough to give the same weight to the Glasses complaints.

(See Bunker post, Ex. "17" and attached hereto as Ex. "C")

The Glasses were treated with kid gloves by Locke, Pancoe, Bunker and Council, when, in reality, the Glasses operated an impact business with impunity.  And it may be true that the Borough only enforced the code because of the multiple complaints by Plaintiffs and their neighbors.  The neighbors who complained seem to be forgotten by Bunker.  He places all of the alleged blame on Plaintiffs.   The obvious inference there is that Bunker didn't mind the neighbors complaining as long as they didn't also run for political office.  On the other hand, only the Glasses complained that Plaintiffs operated an impact business and only Peggy Downs ran for political office against the Jenkintown's majority party endorsed candidate, who was running unopposed.  Pancoe, Locke and Bunker engaged in a clear sham to pretend that Plaintiffs were violating the code so that they could punish and punish and punish the Downses. Given

Bunker's statements above, dismissing him on summary judgment in this case is a manifest error of law and fact.  Harsco Corp. v. Zlotnicki, 779 F.2d at 909.

For purposes of summary judgment, no further evidence of Bunker's dislike and sheer disdain of Plaintiffs needs to be provided.  These posts were made during the election campaign and are in close proximity to the time that Defendants considered issuing a Notice of Violation to Plaintiffs (which was October of 2017) and actually served the Notice to Plaintiffs.  (December 7, 2017)

### 5. The Court Commits Error by Dismissing The Testimony Of Laurie Durkin And Other Evidence of Pancoe's Direct Involvement In The Retaliation

The Court decided that, because Ms. Durkin retired from Borough Council in November of 2016, that her testimony regarding the habits and practices of how Pancoe and Locke operated in 2017 was not "probative."  The Court does not cite any case law to support this position. (Opinion, p. 13)  Federal Rules of Evidence 404(b) and 406 both permit evidence of past acts to prove that a person acted consistently in the present with his/her past habit or practice. See also Browne v. Maxfield, 663 F. Supp. 1193, 1205 (E.D. Pa., 1987) Since Pancoe is a party, who is available to testify, Defendants cannot claim any unfair prejudice as to addressing Ms. Durkin's testimony.  Most evidence is prejudicial.  Fair play would be insured by the fact that Pancoe would have the opportunity to take the stand and testify that she did not customarily direct Locke on matters concerning the Borough.  The jury can decide who is credible.

Prior to resigning in November of 2016, Ms. Durkin had served on Borough Council for 8 years.  For a period of five years, she was in a position to observe how Locke interacted with Pancoe. (N.T. Durkin, p. 60, Ex. "8")  Durkin testified under oath that Locke was heavily advised

by Pancoe and Kilkenny on whether to issue or not issue a notice or citation. (N.T. Durkin, p. 58:17-24; 59:1-9, Ex. "8") Ms. Durkin observed that Locke did not make his own decisions but relied upon the direction of Kilkenny and Pancoe. (N.T. Durkin, p. 60:10-24, Ex. "8") In her role as a member of Borough Council, Ms. Durkin frequently interacted with Mr. Locke and Ms. Pancoe and observed Ms. Pancoe interact with Mr. Locke. (N.T. L. Durkin, p. 12, 16-20, Ex. "8")

The Court erred by not considering in its Decision the material fact that Pancoe had directed Locke not to issue the Notice of Violation before the election. (N.T. Pancoe, p. 150, see Defendants' Statement of Facts) As set forth above, the Court also erred by not considering the material fact that Locke was directed by Pancoe to personally hand the Notice of Violation to Plaintiffs at Borough Hall. (N.T. Locke, p. 70-71, Ex. "7")

The Court also failed to include other evidence of animus that Pancoe had against Plaintiff, which is set forth below.

    a. Pancoe referred to the Downs and their neighbors that complained about the zoning enforcement against the Glasses as the "mad neighbor crew." (N.T. Durkin, p. 26:4-11)

    b. Pancoe chastised Ms. Durkin for hosting a meeting at her house regarding the zoning violations involving the Glasses and showing sympathy to her neighbors and their positions. (N.T. Durkin, p. 26:12-25; 27-29, Ex. "8")

    c. In December of 2017, Pancoe retaliated against Belinda Hull for supporting Plaintiff's candidacy for Mayor. At this time, Ms. Hull was a member of the Jenkintown Zoning Hearing Board and supported Ms. Downs' write-in campaign for Mayor. Ms. Hull's term on the Zoning Board was to be renewed in

January of 2018.  In December of 2017, Pancoe informed Ms. Hull that, because

she supported Plaintiff for Mayor during the 2017 election, that she would not be

reappointed to the Zoning Hearing Board. This action is evidence that Pancoe

harbored resentment and anger toward Plaintiffs.  (See Ex. "2" and N.T. Pancoe,

p. 105-107, Ex. "8")

     d.  Locke, Kilkenny and Pancoe were not happy with Durkin because she

supported the Downses and her neighbors.  (N.T. Durkin, p. 34:14-24, Ex. "8")

     e.  Shortly after Ms. Durkin had a meeting at her home with neighbors

regarding the zoning issues involving the Glasses, Pancoe removed Ms. Durkin

from her position as chair of the Business, Zoning and Revitalization Committee.

In late November of 2016, Ms. Durkin resigned from her position on Borough

Council.  (N.T. Durkin, p. 34:25; 35:1-12, Ex. "8")

The Court overlooked all of the above evidence.  Pancoe's modus operandi is to retaliate

against those that oppose her or disagree with her. That was certainly the case with Durkin and

Hull.   A reasonable inference taken from this  evidence is that Pancoe had animus against

Plaintiffs and those that supported Ms. Downs' candidacy for mayor and those that complained

about how the Borough handled the Glasses zoning violations.  Plaintiffs, who were vocal on

these issues, were likely considered by Pancoe to be the leaders of the "mad neighbor crew."   The

aforesaid evidence is probative of Pancoe's practices and that she disliked Plaintiffs and would act

to retaliate against them.

     Evidence of habit is admissible.  Since Durkin had observed Pancoe and Locke interact for

a period of five years she was in a position to testify as to how they operated, which is clearly

admissible as "habit" testimony. *See* <u>Petrokehagias v. Sky Climber, Inc.</u>, 2000 U.S. Dist. LEXIS

14535 * 8 (E.D. Pa. Sept. 20, 2000) Federal Rule of Evidence 406 provides that "evidence of the

habit of a person … is relevant to prove that the conduct of the person … was in conformity with

the habit or routine practice." <u>Browne v. Maxfield</u>, 663 F. Supp. at 1205; Fed. R. Evid. 404(b)

and 406.

### 6. The Court Misunderstands the Abatement Issue And Failed To Determine That Pancoe and Bunker Wanted Plaintiffs Cited No Matter What

Plaintiffs did not operate an impact business so there was really nothing to abate.

Defendants' mendacity is apparent because they knew this and still refused to meet with Plaintiffs

to discuss this.  Locke testified that he would not cite anyone if they were not actively violating

the Code and he admits that, at the time that Plaintiffs were given the Notice of Violation and

Citation, they were not operating a business. Kilkenny also confirmed that it was the policy in

Jenkintown not to issue notices or citations if the resident was not violating.  (See October 11,

2017 Memorandum, Ex. "14"; N.T. Locke p. 73:11-22, Ex "7"; and, N.T. Kilkenny, p. 53:21-25,

54:1-24, Ex. "23")  Plaintiffs never operated an impact business so they never should have been

issued a notice of violation let alone a Citation.  If they had been operating an impact business,

then they were treated far differently than the Glasses.  And this is the point.  The difference in

treatment between them and the favorable treatment of the Glasses is the tell tale of retaliation.

Pancoe and Bunker were in on the retaliation from the beginning as it relates to whether a meeting

should take place to hear Plaintiffs' address the false allegations that they were operating an

impact business.  Bunker writes to Locke: "Is such a meeting normal in a situation like this?" (See

October 16, 2017 Email, Ex. 32 [page 2 of a string email] also attached hereto as Ex. "D")

Kilkenny responds:

> "Rick: It was my suggestion that we meet with them (the Downs). I did so because I prosecuted the case in front of Judge McHugh and wanted to bring to their attention that the complaints may result in George [Locke] issuing a citation and that they should cease." (Ex. "D" p. 1)

At 11:15 a.m. on November 1, 2017, Pancoe wrote to Locke, regarding issuing Plaintiffs a citation, and stated:

> George,
>
> Thank you for putting together and sharing this comprehensive memo. What next steps are you planning? Do yo have a meeting set up with Sean/Anthony to define next steps? **What support would you like from Council leadership regarding this case?** I have time either early Thursday morning (11/2) or Friday morning (11/3) if you wish to talk.
>
> Deborra

(See November 1, 2017 email chain, Ex. "D")

At 7:06 p.m. on November 1, 2017, Locke responded to Pancoe, cc'd Kilkenny, Bunker and a few others, as follows:

> Hello Deborra (all),
>
> I have already met with Sean and Tony. The next steps are defined. As Sean stated, the next step will be to issue the Violation letter that I drafted. **As directed** I will be holding off on sending that letter until after the election. We have offered to meet with the Downs' to discuss the complaints. The offer will still be in the Violation letter as well as the need to stop the actions shown in photos. **I have no doubt the actions depicted in the photos will stop for the time being.** (Ex. "D")

As of November 1, 2017, Pancoe, Kilkenny and Bunker knew that Plaintiffs were not operating an impact business and, yet, they still issued a notice of violation on December 7, 2017

18

and then a Citation on January 11, 2018. Pancoe and Bunker were seasoned Council members at that time and the Borough's policy was voluntary compliance. Why did they not direct Locke not to issue the Notice when they knew that Plaintiffs were not operating an impact business. The citizens of Jenkintown had also communicated to Pancoe that Plaintiffs did not operate any business:

a. At an October 2017 Council Meeting, many citizens of Jenkintown came to the meeting to protest that Plaintiffs did not operate a business. (N.T. Pancoe, p. 95:7-18, Ex. "B");

b. After the NOV was issued, many citizens of Jenkintown informed Pancoe that Plaintiffs did not operate an impact business. (N.T Pancoe, p. 96, Ex. "B")

c. In the year before the NOV was issued, many citizens of Jenkintown had informed Pancoe that Plaintiffs did not operate a business. (N.T Pancoe, p. 97-98, Ex. "B")

It is Plaintiff's position, based on the Locke Memorandum and other circumstantial evidence, that Defendant Pancoe and Bunker were in on the decision making process to issue the Notice even though they knew that Plaintiffs did not operate an impact business. Their decision to issue the Notice of Violation was only for one purpose, to retaliate. The aforementioned evidence is classic circumstantial evidence and is entitled to the same weight as direct evidence. See Third Circuit Model Jury Instruction 1.6 and Goodman v. Pennsylvania Turnpike Comm'n, 293 F.3d at 670-71.

Pancoe's control over the zoning process is further evidenced by her directing Locke to wait until after the election to issue the Notice of violation. (N.T. Pancoe, p. 150:2-12, Ex. "B") A jury could easily interpret these actions of Pancoe, as President of Borough Council, as being the

one in control of the zoning process.  At the very least they could easily infer that she directed

Locke and told him to issue the NOV to Plaintiffs.

### 7.  The Court Committed An Error By Determining The Facts Regarding The Property Maintenance Errors In Favor of Defendants

Plaintiffs were always in compliance with the Property Maintenance Code.  Being

responsible Citizens, when Plaintiffs received the trumped up written property code violations,

they responded responsibly.  The tree that allegedly was dying was fine.  Plaintiffs disputed that

there was any water runoff but, as good citizens, redirected the route in which the water

dissipated. (See ¶¶ 7-13 in Plaintiffs' Response to MSJ where Plaintiff deny violating the property

maintenance code; ¶¶ 19-20 of Ms. Downs' Affidavit, Ex. "2"; ¶¶ 17-18 of Mr. Downs' Affidavit,

Ex. "3", N.T. M. Downs, p. 109-111, Ex. "28")  Plaintiffs had never been cited prior to this time

with "property maintenance violations".  The fact that Lynch put the violation in writing was

unprecedented and was only done because Pancoe directed him to do that.  (N.T. M. Downs, p.

109-11) During discovery in this case, Plaintiffs requested copies of all property maintenance

violations issued to residents of Jenkintown:

> 30.  For the years 2012 to the present, provide a copy of all the property
> code violation notices and property code violation citations issued to any resident
> of the Borough of Jenkintown.  (See Plaintiffs' Requests To Produce and
> Responses Thereto, Ex. "31")

With the exception of Plaintiffs, Defendants have not provided one property notice

violation citing a resident of Jenkintown for violating Jenkintown's Property Maintenance Code.

(See Ex. "31")

### 8.  Locke Binds Pancoe, Bunker and The Borough By Stating That "We" Look For Voluntary Compliance

A further review of Locke's testimony regarding voluntary compliance is necessary. When he spoke on voluntary compliance, it was clear that he was speaking on behalf of the Borough, which is not surprising since he was authorized by the Borough to speak and act on its behalf. His complete testimony was: "**We** look for voluntarily compliance in that town. **We** go above and beyond trying to get voluntary compliance." (N.T. Locke, p. 40:12-19, Ex. "7")

The notion that Locke acted alone is simply not true. His testimony that it was his decision is false. When viewing all the evidence and communications between Locke, Pancoe, Kilkenny and Bunker, a jury will not believe for one minute that he acted alone. Just because Locke and others may say that he can act on his own does not mean that he did. Ms. Durkin was present when Locke was reluctant to cite the Glasses. Ms. Durkin testified that Pancoe and Kilkenny were upset with her supporting the enforcement of the zoning code against the Glasses. The only reason that Locke cited the Glasses was because Ms. Durkin and the neighbors protested to Council (the Mad Neighbor Crew) that the Borough enforce the Code against the Glasses. The Court overlooked the key testimony, contained in the Counterstatement of Facts, of Ms. Durkin:

> 48. George Locke would not issue Notices of Violation without the approval of Pancoe and Kilkenny. Pancoe acted as George's direct supervisor. He sought approval, validation and affirmation from Pancoe with regard to any significant decision. (N.T. L. Durkin, p. 18-19, Ex. "8") In her role as a member of Borough Council, Ms. Durkin frequently interacted with Mr. Locke and Ms. Pancoe and observed Ms. Pancoe interact with Mr. Locke. (N.T. L. Durkin, p. 12, 16-20, Ex. "8")

> 49. When it came to enforcing the Borough Code, Locke was reluctant to enforce it. Locke believed that the Zoning Code was a "gray area" and difficult to enforce. (N.T. Durkin, p. 20:21-25; 21:11, Ex. "8") Two contracting businesses in town were not cited for operating impact businesses from their homes. (N.T. Durkin, p. 22:8-18)

50.  Like Locke, Deborra Pancoe was also reluctant to enforce the zoning code against the Glasses.  (N.T. Durkin, p. 25:3-8, Ex. "8")   Mr. Locke was frustrated that Plaintiffs voiced their dissatisfaction with the manner in which he enforced the zoning code.  Pancoe referred to the Downs and their neighbors that complained about the zoning enforcement as the "mad neighbor crew."  (N.T. Durkin, p. 26:4-11)

51.  Ms. Durkin and the Downses hosted neighborhood meetings to address the Borough's reluctance to enforce the Borough's codes.  Pancoe chastised Ms. Durkin for hosting a meeting at her house and showing sympathy to her neighbors and their positions.  (N.T. Durkin, p. 26:12-25; 27-29, Ex. "8")

52.  In public meetings, Kilkenny supported Locke's vague interpretation of the zoning code and supported Locke's handling of the Glasses zoning violations.  (N.T. Durkin, p. 31:11-24, Ex. "8")

53.  Locke, Kilkenny and Pancoe were not happy with Durkin because she supported the Downses and her neighbors.  (N.T. Durkin, p. 34:14-24, Ex. "8")

54.  Shortly after Ms. Durkin had a meeting at her home with neighbors regarding the zoning issues, Pancoe removed Ms. Durkin from her position as chair of the Business, Zoning and Real Estate Committee. In late November of 2016, Ms. Durkin resigned from her position on Borough Council.  (N.T. Durkin, p. 34:25; 35:1-12, Ex. "8")

Ms. Durkin had an insider's view of how council and Pancoe interacted with George Locke for a period of five years.  She was on council and in the conversations with regarding whether to cite the Glasses in 2016.  Pancoe removed Durkin from her position as chair of the Business, Zoning and Revitalizatin Committee because of her support for enforcing the zoning code against the Glasses.  Because of her position on Council and the years served on Council, Durkin is well qualified to describe the habits and practices in which Pancoe and Locke operated and this evidence is admissible under F.R.E. 404(b) and 406.   Durkin's evidence makes clear that Locke did not act alone.  Any determination that Locke acted alone disregards the substantial record to the contrary.  Any such determination constitutes a usurpation of the jury's role to assess

a) the weight of evidence; b) the credibility of witnesses; and, c) to decide the facts of the case that would lead them to render a verdict.

### B. THE COURT MADE AN ERROR OF LAW IN DETERMINING THAT PANCOE AND BUNKER WERE NOT DECISION MAKERS

"A plaintiff may show that a defendant is personally involved by providing evidence of "the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." Opinion at 12 *citing* <u>Chavarriaga v. New Jersey Dept. Of Corr.</u>, 806 F.3d 210, 222 (3d Cir. 2015) *and* <u>J.M.K. v. Luzerne City</u>, 372 F.3d 572, 586 (3d Cir. 2004) ("[A] supervisor may be personally liable under 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations.")

The Court's Decision finds that the issuance of the Notice of Violation ("NOV") was Locke's call and Pancoe and Bunker did not 'direct' him to issue such.  However, if it was exclusively Locke's call, then why would he have complied with Pancoe's (and Kilkenny's) requests to defer the issuance of Notice until after the election?  If there was a legitimate violation of the code, why would a pending election have any bearing on zoning code compliance?  Further, Locke's compliance letter of 10/11/2017 to Council (Pancoe and Bunker) specifically states that he was to send "a request for a meeting with David and Margaret Downs". Since the supposed intent of the 'meeting' was to discuss the alleged violation (prior to the issuance of the NOV) and if the objective of this discussion was to seek "voluntary compliance" (as testified by Locke), why would Pancoe and Bunker (and Kilkenny) object to scheduling such a

meeting in October?  The reason is that Pancoe and Bunker knew that Locke's

(and Kilkenny's) intention was never to meet with the Downses to remediate any alleged

violations (because they knew there were none), but rather meet with the Downses to humiliate

them with the presentation of the then-already prepared (and fabricated) NOV.

This evidence demonstrates that Pancoe and Bunker had specific knowledge of the

intentional wrongdoing by virtue of Locke's memo to them.  They knew the NOV was already

prepared to be issued without any opportunity to abate.  Their stance as officials and Locke's

superiors, should have been to ensure that an alleged violation was vetted for proper and timely

remediation. Rather, they asked Locke to defer the issuance of such until after the election so as

to

avoid the potential (and eventually inevitable) public controversial uproar of the obvious

retaliation on behalf of the Borough during the pre-election day period.  Accordingly, Pancoe and

Bunker condoned the illicit actions of Locke. Pancoe and Bunker evidence their participation in

the retaliation by virtue of acquiescing to both the issuance and, more importantly, the reissue of

the NOV in December and March, respectively. Their knowledge and silence on the issue

corroborates their condonation, support and participation in the blatant retaliation efforts.

"To be personally liable under 1983, the Court must determine whether they were

personally involved in the alleged retaliation against plaintiffs" Opinion p. 13. For purposes of

summary judgment the Court committed manifest errors of fact by deciding that Pancoe and

Bunker

were not involved.  The Court found that Locke "answers" to the Borough Council and therefore

the Council. (Opinion p. 2 and see N.T. Kilkenny p. 24:8, Ex. "23")   Pancoe and Bunker had not

only the authority, but more importantly, a fiduciary responsibility and obligation to:

a.  Question Locke's level of diligence in justifying his intent to issue the original NOV (as he provided ripe opportunity to do so when he presented his memo of intent to Council);

b.  Describe exactly how he (fairly) treated the Downses and the Glasses equally and the 'same'.  Knowing how the Glasses had opportunities to abate and cure a violation, why didn't Pancoe, Bunker (and Kilkenny) question Locke about not providing the same opportunity to the Downses?

c.  Question what inspections were completed (per Downs's requests to Locke, Pancoe, Bunker and Boro Council as well as in accordance to the same treatment as Glass) and what investigation was done to justify the violation;

d.  Question why Locke was issuing a notice of violation using only pictures and videos from Glass, a neighbor that Pancoe and Bunker were well aware of; any official without retaliation intentions would be suspect of a complaint made by the Glasses against the Downses.

The merits of whether the Downses committed a zoning violation, for purposes of summary judgment, must be found in favor of Plaintiffs and, therefore, it is of great significance to this case to callout the following:

a.  Locke issued the NOV, the citation and the subsequently re-issued NOV using photos and video provided by the Glasses as the evidence to the support the NOV.

b.  As mentioned previously, Locke did not conduct his own investigation and never once attempted to complete an on-site inspection, in spite of repeated requests by the Downses to do so.

c.  What is so critical here is that the photos and videos (provided by the Glasses) show Mr. Downs cutting his own lawn.  They also show Mr. Downs cutting his Mother's lawn, which is immediately next-door to Downs.  Locke and Kilkenny knew this and were easily able to identify the location of the photos and videos.  If we pretend that they did not know the location where the photographs and videos were taken, didn't Locke (and Kilkenny, as Solicitor) have an obligation to question the Glasses and more importantly, the Downses, before simply issuing a NOV?

d.  From a Borough Policy position, why didn't Pancoe and Bunker question the intent to meet with the Downses to issue the NOV?  Why not just mail it like is the case with all other NOV issuances?  As stated before, Defendants wanted to intimidate and embarrass Plaintiffs by personally handing the NOV to them.

e.  Why didn't Pancoe and Bunker question Locke about why the public had turned out in mass number at a Borough Council meeting to request the Borough stop the enforcement against the Downs as everyone knew there was no business (see Pancoe testimony);

f.  Why did two different attorneys, representing Downs, send notices to the Borough.  Both attorneys not only stated that the Downses were not violating the code, but also requested meetings to discuss the allegations. No meeting was ever held. Again,

the only plausible explanation is retaliation and the direction of and/or acquiescence of Bunker and Pancoe of Locke's conduct and actions.

        g.  Finally, did Pancoe and Bunker deliberate as to the amount of legal expense and personnel resources needed by the Borough to pursue this action against the Downses.

What consideration was contemplated to ensure that the Borough was not spending unnecessary money to pursue a matter that the public obviously did not support and that had so many unanswered questions and issues.

      The reason Pancoe and Bunker chose not to ask these questions and/or require Locke to justify his reasoning and provide backup support for issuing a NOV was because Pancoe and Bunker knew that there was no impact business and, therefore, no reason to issue the NOV.  The only purpose of this NOV was retaliation.  A jury will easily infer from the aforesaid evidence that Locke reports directly to Borough Council, specifically, Pancoe.  A jury will reasonably infer that Pancoe and Bunker were well aware of the intentions behind their 'strong-arming' tactics. Therefore, Pancoe, Bunker and thereby, the Borough of Jenkintown, violated the Downses rights by virtue of having the knowledge of and passively accepting their subordinate's actions against the Downses.  Plaintiff's circumstantial evidence trumps the arguments of Bunker and Pancoe that they did not direct or cause the actions of Locke and the false allegation by Defendants that Locke acted alone.  See <u>Goodman v. Pennsylvania Turnpike Comm'n.</u>, 293 F.3d 670-71. (Proof of

knowledge can take the from of direct or circumstantial evidence.)  By comparison, here the

circumstantial evidence shows that Pancoe and Bunker were the decision makers that directed

Locke's retaliatory actions.  The evidence and common sense show that they also had consented

to

and acquiesced in the retaliatory acts of Locke.  With the record that Plaintiffs have presented, to

determine otherwise, at the summary judgment stage, would be a manifest error of fact and law.

### C.  JENKINTOWN IS SUBJECT TO MONELL LIABILITY

By virtue of the fact that Defendant Pancoe and/or Bunker are subject to 1983 liability,

then so is the Borough of Jenkintown. If the Court decides not to reverse the May 22, 2020 Order

as it pertains to Pancoe and Bunker then Jenkintown should still be reinstated as a Defendant

because Locke was a policy maker.

The Court made a manifest error of law by determining that Borough Manager Locke did

not possess "final authority to establish municipal policy" with respect to the actions he ordered,

namely to issue notices of violations and citations.  Opinion p. 25 *citing* Pembaur v. City of

Cincinnati, 475 U.S. 469, 481 (1986).  The Court decided in its opinion that Locke had the

discretion and authority to act on his own when issuing notices of violation and citations. On p.

13

of the Opinion, the Court found:  "The record demonstrates that Locke has discretion to issue a

Notice of Violation and may do so independently and without approval from the Borough

Council or members of Borough Council."  (Ex. "A" p. 13-14)

Chapter 31, Section 4 of the Borough of Jenkintown Code provides the Borough

Manager with vast powers of policy making and enforcement and provides:

28

§ 31-4 Powers and duties.

A. The Borough Manager shall be the chief administrative officer of the Borough and shall be responsible to Borough Council as a whole for the proper and efficient administration of the affairs of the Borough placed in his charge. The powers and duties of administration of all Borough business shall be vested in the Borough Manager unless expressly imposed by statute upon other Borough officers or officials.

B. The powers and duties of the Borough Manager shall include the following:

(1) To supervise and to be responsible for the activities of all municipal departments.

(2) To appoint and, when necessary for the good of the service, to suspend or remove all officers and employees under his supervision, provided that persons covered by civil service provisions shall be appointed, suspended or removed in accordance with such provisions, and further provided that the Borough Manager shall report at the next meeting thereafter of Borough Council any action taken by authority of this subsection. All recommendations for appointment or removal shall be based solely on the merit, qualifications or disqualifications of the official concerned, without regard to his political beliefs or affiliations.

(3) To prepare and submit to Borough Council a personnel system for the Borough based upon merit principles, and to be responsible for the administration of such after its adoption and/or revision.

(4) To prepare and submit to Borough Council the annual budget, together with a message describing the important features, and to be responsible for the administration of such after its adoption.

(5) To prepare the agenda for each meeting of Borough Council and supply facts pertinent thereto, and to attend all meetings of Borough Council with the right to take part in the discussions.

(6) To negotiate contracts for the Borough, subject to the approval of Borough Council; to make recommendations concerning the nature and location of municipal improvements; to execute municipal improvements as determined by Borough Council; to see that the provisions of all contracts, franchises, leases, permits and privileges granted by or executed on behalf of the Borough are faithfully observed; and to employ, when directed by Borough Council, experts and consultants to

perform work and to advise in connection with any of the functions of the
     Borough.

(7) To submit to Borough Council, as soon as possible after the close of the fiscal
year, a complete report on the finances and the administrative activities of the
Borough for the preceding year; to keep Borough Council informed as to the
conduct of all Borough affairs; to submit periodic reports on the condition of
Borough finances and such other reports as Borough Council requests; and to
recommend adoption of such measures as he may deem necessary or expedient for
the health, safety or welfare of the community or for the improvement of
administrative services.

(8) To investigate all complaints regarding Borough services and to report to
Borough Council thereon. All complaints regarding Borough services shall be
referred to the Borough Manager.

(9) To see that all laws, provisions of this chapter and actions of Borough Council,
subject to enforcement by him or by officers subject to his direction, are faithfully
executed.

(10) To perform such other duties as may be required by ordinance, resolution or
motion of Borough Council, and to be responsible to Borough Council for
     carrying
out all policies established by it and for the proper administration of all affairs of
the Borough within the jurisdiction of Borough Council.

  Borough of Jenkintown Code, Section 31-4(A); 31-4(B)(1) - (10) While this Code was

not cited in Plaintiff's initial Response To Defendants' Motion For Summary Judgment, for

reasons of justice, Plaintiff asks the Court to reconsider its determination that Locke was not a

policy making official.  A review of the Jenkintown Code provides that: "The powers and duties

of administration of all Borough business shall be vested in the Borough Manager unless

    expressly

imposed by statute upon other Borough officers or officials."  Id.  He is charged with

"investigating all complaints regarding Borough services" enforcing all codes Borough and "for

carrying out all policies established by it and for the proper administration of all affairs of the

Borough within the jurisdiction of Borough Council." Jenkintown Code 31-4(B)(9) & (10) For the

foregoing reasons, Locke was a policy maker and, therefore, Jenkintown should remain as a

Defendant. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. at 481.


    */s/ William J. Fox*
WILLIAM J. FOX, ESQUIRE
Attorney for Plaintiff
1626 Pine Street                                        +
Philadelphia, PA 19103

Date: June 18, 2020

## CERTIFICATE OF SERVICE

    I, William J. Fox, Esquire, attorney for Plaintiff, hereby certify that a true and correct

copy of the foregoing Motion For Reconsideration and Brief was served upon counsel for

Defendants electronically at the address below:

    Suzanne McDonough, Esquire

    Holsten & Associates

    One Olive Street

    Media, PA 19063


    */s/ William J. Fox*
WILLIAM J. FOX, ESQUIRE

Date: June 18, 2020