Exhibit "A"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DAVID B. DOWNS, and**<br>**MARGARET A. DOWNS,**<br>            **Plaintiffs,**<br><br>      v.<br><br>**BOROUGH OF JENKINTOWN,**<br>**DEBORA PANCOE,**<br>**RICHARD BUNKER, and**<br>**GEORGE LOCKE,**<br>            **Defendants.** | **CIVIL ACTION**<br><br><br>**NO.  18-4529** |

DuBois, J.                                                    May 22, 2020

## M E M O R A N D U M

### I.    INTRODUCTION

In this case, plaintiffs, David and Margaret Downs, assert that the Borough of Jenkintown ("the Borough") and the individually named defendants retaliated against them by falsely accusing them of violating the Jenkintown Zoning Code ("Zoning Code") as a result of the exercise by plaintiffs of their First Amendment rights.  Presently before the Court is defendants' motion for summary judgment.  For the reasons set forth below, the motion is granted in part and denied in part.

### II.   BACKGROUND[1]

#### A.  The Borough Government and Zoning Code

The Borough is managed by a council of twelve members (the "Borough Council"). Locke Dep. 137:1-138:15.  At all relevant times, defendant Debora Pancoe was the President of the Borough Council, Pancoe Dep. 8:10-12, defendant Richard Bunker was the Vice President of the Borough Council, Bunker Dep. 13:17-14:6, and defendant George Locke was the Borough

---

[1]    The facts are presented in the light most favorable to plaintiffs.  Disputed facts are noted as such.

1

Manager, Locke Dep. 25:25-26:1. Locke testified that he reports to the Borough Council, but primarily answers to the Borough president. *Id.* at 26:2-5. In addition to his duties as Borough Manager, Locke also handled "code and enforcement, and zoning matters." *Id.* at 15:7-9.

Pursuant to the Zoning Code, properties zoned in the B-1 Residential District may only operate a "No Impact home-based business." Defs.' Ex. B. Properties zoned in the B-1 Residential District are prohibited from operating an impact home-based business ("impact business"). Defs.' Ex. B. If Locke or a zoning enforcement officer determines that a resident is violating the Zoning Code, he may issue an Official Notice of Zoning Code Violation ("Notice of Violation"). Locke Dep. 36:1-14. A Notice of Violation instructs the resident to cease violating the Zoning Code, and either: (1) inform the Borough, in writing, of the resident's intent to comply, or (2) request a hearing before the Jenkintown Borough Zoning Hearing Board ("Zoning Hearing Board"). Defs.' Ex. B. If a resident does not appeal the Notice of Violation to the Zoning Hearing Board within 30 days of receipt, the resident forfeits the right to challenge the Notice of Violation on the merits, and the Borough may issue a citation. Locke Dep. 46:8-47:2.

Locke testified that he kept the Borough informed of his actions regarding his enforcement of the Zoning Code. Locke Dep. 49:8-19, 63:16-19; Pls.' Ex. 14. Locke, however, has discretion to issue Notices of Violation, and may do so without approval from the Borough Council or individual members of the Borough Council. Locke Dep. 48:15-49:19; Pancoe Dep. 42:25-43:5, 52:13-17; Bunker Dep. 85:10-86:22. Lori Durkin, a former member of the Borough Council, testified that during the time she served on the Council, which ended in November 2016, Locke was "heavily advised" by Pancoe, the Borough President, and Locke would not issue a Notice of Violation without "approval" from Pancoe. Durkin Dep. 34:25-35:5, 57:10-

60:23.

## B.  Plaintiffs' Complaints Against the Glasses

Plaintiffs reside at 301 Runnymede Avenue in the Borough of Jenkintown.  Pls.'
Counterstatement Facts ¶ 1.  In August 2016, Joseph and Christine Glass rented the house next
door to the plaintiffs.  *Id.* ¶ 3.  Plaintiffs' property and the home the Glasses were renting were
zoned in the B-1 Residential District.  *Id.* ¶ 4; Def.' Ex. B.  Shortly after the Glasses moved in
next door to the plaintiffs, the Borough received at least 20 complaints, from the plaintiffs and
other neighbors, that the Glasses were operating an impact business, a construction business, in
violation of the Zoning Code for the B-1 Residential District.  Locke Dep. 39:18-40:5; Pls.' Ex.
29.  On September 6, 2016, after investigating the numerous complaints against the Glasses,
Locke issued a Notice of Violation to the Glasses for operating an impact business.  *Id.* at 40:6-
16.  In response, according to Locke, the Glasses stated "they would stop doing what they were
doing that was not allowed," and comply with the Zoning Code.  *Id.*

Locke testified that the Borough "look[s] for voluntary compliance," and "go[es] above
and beyond trying to get voluntary compliance" with Notices of Violation.  Locke Dep. 40:6-16.
To ensure that the Glasses came into compliance with the Zoning Code, Locke and Durkin
inspected the Glasses' property and spoke with the Glasses regarding their compliance with the
Zoning Code.  Locke Dep. 40:20-41:6; Durkin Dep. 23:1-10.  Locke gave the Glasses a
"checklist to fill out and complete" so they could come into compliance with the Zoning Code.
Durkin Dep. 23:1-13; Locke Dep. 38:8-23.  Locke concluded that the Glasses complied with the
September 6, 2016 Notice of Violation.  Pls. Ex. 9; Locke Dep. 43:10-12.

Plaintiffs contended that the Glasses continued to operate an impact business, so they
continued to file complaints against them with Locke and the Borough.  Pls.' Ex. 10; Pls.'

3

Counterstatement Facts ¶ 12.  Plaintiffs "appeared before the Borough Council on multiple

occasions[, from 2016 to 2017,] and voiced complaints about the manner in which George Locke

and the Borough enforced the zoning code against the Glasses."  Pls.' Counterstatement Facts

¶ 21.[2]  Locke testified that he "didn't enjoy" the way the plaintiffs acted toward him with respect

to their complaints about the Glasses.  Locke Dep. 84:24-85:17 (stating that he "didn't enjoy,"

*inter alia*, the plaintiffs telling him that he was "awful" at his job).  Plaintiffs also made 25

separate requests for public information ("Right-to-Know requests") from September 16, 2016

until November 22, 2017, seeking a wide range of information.  Pls.' Ex. 15.  Locke was aware

of these requests and assisted in preparing responses.  Locke Dep. 116:10-21.

Ultimately, in "September of 2017, due to her dissatisfaction with the manner in which

the Jenkintown Borough Council governed, Ms. Downs entered the Jenkintown Mayor's race as

a Democrat and write-in candidate."  Pls.' Counterstatement Facts ¶ 22.  Mr. Downs supported

his wife's campaign for mayor.  D. Downs. Dep. 15:19-23, 24:4-17.  During Ms. Downs'

campaign for mayor, Borough Vice President Bunker made several comments on social media

opposing Ms. Downs' candidacy.  Pls. Ex. 17.  Specifically, Bunker stated that: Ms. Downs

would be a "disaster" as a mayor, she "cost the taxpayers of the Borough tens of thousands of

dollars on pointless right-to-know requests in her attempt to twist zoning law to run her neighbor

out of town," and "she wanted council to lean on police and zoning to unevenly enforce law and

code, to mess with her neighbor."  *Id.*  The election was held on November 7, 2017.  Pancoe

Dep. 74:16-17.  Ms. Downs was defeated.  Pls.' Counterstatement Facts ¶ 33.

---

[2]      Plaintiffs' counterstatement of facts states that "[f]rom 2016 until 2018, Plaintiffs appeared before the
Borough Council on multiple occasions and voiced complaints about the manner in which George Locke and the
Borough enforced the zoning code against the Glasses."  Pls. Counterstatement Facts ¶ 21 (citing to Pls.' Ex. 2, 3).
However, plaintiffs' Exhibit Two and Exhibit Three state that they appeared before the Borough Council "from
September of 2016 into 2017."  Pls.' Exs. 2, 3.

4

### C. The Glasses' Complaints About the Plaintiffs

On October 25, 2016, shortly after plaintiffs began complaining that the Glasses were operating an impact business, the Glasses filed their first complaint with the Borough asserting that the plaintiffs were operating an impact business—a landscaping business. Pls.' Ex. 14. Locke investigated the Glasses' complaint against the plaintiffs, and concluded that "the evidence provided [by the Glasses against the plaintiffs] did not rise to the level of operating a business." *Id.* However, the Glasses "adamantly disagreed" with Locke. *Id.* Locke directed the Glasses to "report any new activity to the Borough for review." *Id.* Approximately one year later, on September 20, 2017, during Ms. Downs' campaign for mayor, the Glasses filed a second complaint with the Borough alleging that plaintiffs were operating an impact business. Pls.' Ex. 14. The Glasses filed three additional complaints against plaintiffs on September 25th, 29th, and October 4th, 2017. *Id.* In support of their complaints, the Glasses submitted photographs and videos that purported to show that plaintiffs were operating an impact business. *Id.*

Locke testified that, after the Glasses' first complaint against the plaintiffs in October 2016, but before their second complaint in September 2017, Magisterial District Judge Elizabeth McHugh, issued a ruling, which interpreted the definition of an impact business under the Zoning Code in a way that encompassed a broader range of activities. Locke Dep. 52:23-54:2. The plaintiffs deny that any such ruling was made by Judge McHugh, and significantly, no such ruling was included in the record. Pls.' Resp. 24, ¶ 87-89. Locke applied this new interpretation of the Zoning Code by Judge McHugh when he reviewed the Glasses' 2017 complaints against the plaintiffs. Locke Dep. 52:23-54:2.

**D. Locke's Response to the Glass' 2017 Complaints About the Plaintiffs**

Locke reviewed the evidence submitted by the Glasses that purported to show that plaintiffs were operating an impact business from their home. Pls.' Ex. 14. Locke then sought legal advice from Borough Solicitor Sean Kilkenny regarding whether the evidence against the plaintiffs was sufficient to issue them a Notice of Violation for operating an impact business. Locke Dep. 63:8-15, 66:14-17. Locke was advised that "there was enough evidence" to issue a Notice of Violation to the plaintiffs for operating an impact business. Kilkenny Dep. 17:1-5. Specifically, Kilkenny told Locke that "he had a reasonable basis" to issue the Notice of Violation "based on the evidence and based on Judge McHugh's version of how she was interpreting the Code." Kilkenny Dep. 49:23-50:7.

On October 11, 2017, Locke informed the Borough Council that he believed that the evidence against the plaintiffs was sufficient to issue a Notice of Violation. Pls.' Ex. 14; Locke Dep. 63:16-19. According to Locke, it was his "call" to issue the Notice of Violation to the plaintiffs. Locke Dep. 72:8-10. Additionally, Locke testified that he does not remember Bunker, the Borough Vice President, "ever mention[ing] anything about issuing the Notice of Violation . . . to the [plaintiffs] prior to [Locke] doing it." Locke Dep. 71:16-71:19. Ms. Downs, however, testified that she has "strong beliefs" that Locke was directed by Borough President Pancoe to issue the Notice of Violation to the plaintiffs. M. Downs Dep. 100:24-101:11. Ms. Downs also testified that, "by virtue of his Facebook posts," Bunker made "it very clear that he was in favor of this target against us." *Id.* at 103:2-8. She added that she had a "suspicion" that Locke's actions were directed by Kilkenny, but admitted that she had no "direct evidence" that Locke was directed to issue the Notice of Violation to the plaintiffs by anyone. *Id.* at 97:16-98:12; 108:14-109:1.

6

After Locke informed the Borough Council that he believed there was sufficient evidence to issue a Notice of Violation to the plaintiffs, he was advised by Kilkenny and Pancoe to delay issuing the Notice until after the mayoral election because they did not want to appear to be interfering with the election. Locke Dep. 72:11-73:10. Locke complied. On December 7, 2017, one month after the mayoral election ended, Locke and Kilkenny met with plaintiffs and issued a Notice of Violation to them which charged that they were operating an impact business. Pls.' Counterstatement Facts ¶ 33.

Ms. Downs stated that after Locke issued the Notice of Violation to the plaintiffs on December 7, 2017, they made numerous requests to meet with him and explain that they were not operating an impact business, but he never replied. M. Downs Dep. 171:19-172:14; Pls.' Ex. 25; Pls.' Ex. 2.[3] In addition, Ms. Downs stated that the plaintiffs invited Locke to inspect their home to determine whether they were operating an impact business, but he did not reply. M. Downs Dep. 171:19-172:14; Pls.' Ex. 2, ¶ 32. Borough residents also appeared at Borough Council meetings and stated that the plaintiffs did not operate an impact business, which gave Locke "pause." Locke Dep. 72:3-7. Furthermore, Ms. Downs testified that Locke and the Borough never gave them an opportunity to come into voluntary compliance with the Code, and treated the plaintiffs differently than they treated the Glasses. *See* M. Downs Dep. 171:19-172:14; Pls.'s Ex. 2. Locke, however, testified that he gave the plaintiffs the opportunity to voluntarily comply with the Code, but plaintiffs responded that they were not violating the Code. Locke Dep. 68:24-69:6, 69:25-70:10. Locke, also, testified that he treated both the plaintiffs and

---

[3] In their response to plaintiffs' counterstatement of facts, defendants objected to, and moved to strike, Plaintiffs' Exhibits 2-6 because those exhibits were submitted as "certifications," which defendants argue are improper under Federal Rule of Civil Procedure 56. Defs.' Resp. Counterstatement Facts at 1. In response, plaintiffs filed affidavits, affirming the accuracy of their certifications previously submitted as plaintiffs' Exhibits 2 and 3. Pl.' Praecipe Supp. Pls.' Counterstatement Facts & Resp. Defs.' Mot. Summ. J. (Doc. No. 30, filed January 6, 2020). Defendants did not object to plaintiffs' affidavits. The Court concludes that Plaintiffs' Exhibits Two and Three, as affirmed, satisfy Rule 56.

7

the Glasses "exactly the same." Locke Dep. 150:3-9.

Shortly after plaintiffs received the Notice of Violation, their attorney sent Locke a letter

that stated: "rest assured that the Downs' are, and always have been, in compliance with any and

all Permitted Uses as defined in the applicable section of the Jenkintown Borough Code." Pls.'

Ex. 20. An attorney from Kilkenny's law firm, responded on December 21, 2017, replying that:

"The Borough has determined that Mr. and Mrs. Downs are in violation of the Borough's Zoning

Code," and if the plaintiffs disagreed with the Borough's determination, they needed to file an

appeal to the Zoning Hearing Board by January 6, 2018. Pls.' Ex. 21. The plaintiffs did not

appeal the Notice of Violation to the Zoning Hearing Board. Locke Dep. 73:23-74:1. As a

result, Locke issued a citation to the plaintiffs on January 11, 2018. Locke Dep. 113:1-114:14.

Locke testified that no one instructed him to issue the citation. Locke Dep. 73:23-74:1.

After Locke issued a Citation to the plaintiffs, the case was brought before Judge

McHugh on March 26, 2018. Locke Dep. 91:17-92:7. Judge McHugh determined that, for a

reason not related to this case, the original Notice of Violation was defective, so she

recommended that it be reissued. *Id.* Locke reissued the Notice of Violation to the plaintiffs that

same day. Locke Dep. 93:13-18, 94:19-21. Locke testified that he was not instructed by any

member of the Borough Council to reissue the Notice of Violation to the plaintiffs, and that "[i]t

was [his] decision." *Id.* The plaintiffs appealed the second Notice of Violation to the Zoning

Hearing Board. Locke Dep. 124:20-25. After several hearings, the Zoning Hearing Board

issued a decision in plaintiffs' favor and vacated the second Notice of Violation. Locke Dep.

128:8-12. Locke testified that he "wasn't surprised" by the Zoning Hearing Board's decision in

the plaintiffs' favor. Locke Dep. 128:24-129:2.

### E. Property Maintenance Notices

During Ms. Downs' campaign for mayor, Kevin Lynch, a Property Maintenance Code Enforcement Officer for the Borough two property maintenance notices to the plaintiffs for failing to comply with the property maintenance code. Defs.' Exs. E, I. Lynch issued the first property maintenance notice on September 13, 2017, in response to a complaint by the Glasses about an allegedly "dead and / or dying" tree on plaintiffs' property. Defs.' Exs. E, F. Plaintiffs arranged for an arborist to inspect the tree and the arborist determined that the tree was healthy but two branches needed to be cut. Defs.' Ex. G. Plaintiffs informed Lynch of the arborist's findings. *Id.* Lynch responded on October 27, 2017, and stated that the plaintiffs were now in compliance with the property maintenance code after having an arborist inspect the tree. Defs.' Ex. H. On October 20, 2017, Lynch issued a second property maintenance notice to plaintiffs in response to the Glasses' complaint that the plaintiffs were directing storm water toward their property, causing damage to it. Defs.' Exs. I, J. Plaintiffs complied with the second property maintenance notice by installing an extension that corrected the water run-off problem. Defs.' Ex. K.

Ms. Downs testified that she "thinks" Pancoe, Kilkenny, and Locke directed Lynch to issue the property maintenance notices to the plaintiffs. M. Downs Dep. 110:16-20. Additionally, she testified that Lynch told her that he was instructed by Pancoe to put the property maintenance notices in writing because of Ms. Downs' campaign for mayor. *Id.* at 109:9-22. Mr. Downs also testified that he "think[s]" that the Borough selectively enforced the property maintenance code, D. Downs Dep. 154:7-15, and only enforced it against the plaintiffs because of his wife's campaign for mayor, D. Downs Dep. 153:8-23. He based this belief on his observations of properties that were supposedly in violation of the property maintenance code

that he thinks did not receive a property maintenance code violation.  Pls.' Resp. Defs.'

Statement Facts ¶ 24; D. Downs Dep. 153:1-156:3.

### F.  Procedural History

Plaintiffs filed a Complaint on October 23, 2018.  On December 10, 2018, plaintiffs filed

an Amended Complaint against the Borough; Sean Kilkenny, Solicitor to the Borough; Debora

Pancoe, Borough Council President; Richard Bunker, Borough Council Vice President; and

George Locke, the Borough Manager (Document No. 4).  The Amended Complaint asserted

three claims: (1) First Amendment retaliation pursuant to § 1983 against all defendants (Count I);

(2) state law abuse of process against Solicitor Kilkenny and Borough Manager Locke (Count

II); and (3) state law conspiracy against Solicitor Kilkenny and Borough Manager Locke (Count

III).  First Am. Compl. 9-12.

By Memorandum and Order dated March 22, 2019, the Court granted in part and denied

in part defendants' motion to dismiss.  The Court dismissed: (1) the First Amendment retaliation

claim (Count I) against defendants Pancoe, Bunker, and Locke in their official capacities; (2) the

state law abuse of process claim (Count II) against defendants Kilkenny and Locke; and (3) the

First Amendment retaliation (Count I) and state law civil conspiracy (Count III) claims against

defendant Sean Kilkenny in both his official and individual capacity.  The remaining claims in

the case are: (1) the First Amendment retaliation claim against Pancoe, Bunker, and Locke in

their individual capacities (Count I); (2) the First Amendment retaliation claim against the

Borough (Count I); and (3) the civil conspiracy claim against Locke in his official and individual

capacity (Count III).

On November 15, 2019, defendants moved for summary judgment on all remaining claims (Document No. 19).  Plaintiffs responded on December 20, 2019 (Document No. 25). The motion is thus ripe for decision.

## III.    LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.  However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.*  In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## IV.    DISCUSSION

Defendants moved for summary judgment on each of plaintiffs' remaining claims—(1) the First Amendment retaliation claim against Pancoe, Bunker, and Locke in their individual capacities (Count I); (2) the First Amendment retaliation claim against the Borough (Count I);

11

and (3) the civil conspiracy claim against Locke in his official and individual capacity (Count

III).  The Court addresses each in turn.

### A. First Amendment Retaliation Claims Under § 1983 Against the Individual Defendants in Their Individual Capacities (Count I)

In their motion for summary judgement, defendants argue that (1) plaintiffs' First

Amendment retaliation claim against the individual defendants has "no evidentiary support," (2)

the plaintiffs cannot meet their burden of proving their protected activities were the cause of the

individual defendants' actions, (3) there was probable cause to issue the Notice of Violation to

the plaintiffs, and (4) even if the Court concludes that plaintiffs have provided sufficient

evidence of First Amendment retaliation by the individual defendants, they are entitled to

qualified immunity.  *See* Defs.' Mot. Summ. J. at 5-15.  The Court addresses each argument in

turn.

To prevail on a § 1983 claim against an individual defendant, "plaintiff must show that

defendant[,] acting under color of state law, deprived him of a right secured by the Constitution

or the laws of the United States."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir.

1997).  Importantly, "[a] defendant in a civil rights action must have personal involvement in the

alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Chavarriaga v. New Jersey Dep't of

Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).  A plaintiff may show that a defendant is personally

involved by providing evidence of "the defendant's participation in or actual knowledge of and

acquiescence in the wrongful conduct."  *Chavarriaga*, 806 F.3d at 222; *see also A.M. ex rel.

J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) ("[A] supervisor may

be personally liable under § 1983 if he or she participated in violating the plaintiff's rights,

directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in

his subordinates' violations."). Thus, in order for Pancoe, Bunker, or Locke to be personally

liable under § 1983, the Court must determine whether they were personally involved in the

alleged retaliation against plaintiffs.

        i.    *Borough Council President Debora Pancoe*

      Plaintiffs assert that the evidence shows that Borough Council President Debora Pancoe

directed Locke to issue the Notice of violation and that "Locke would not have issued the Notice

of Violation and Citation to Plaintiffs unless Pancoe directed it." Pls.' Resp. at 35. Specifically,

plaintiffs argue that Durkin's testimony creates a genuine issue of material fact regarding

Pancoe's personal involvement in the alleged retaliation against plaintiffs. *Id.* The Court

disagrees.

      Durkin testified that Locke was "heavily advised" by Pancoe, and that Locke would not

issue a Notice of Violation without "approval" from Pancoe. Durkin Dep. 57:10-60:23.

However, Durkin lacks personal knowledge of Locke's decision to issue the Notice of Violation

to the plaintiffs in 2017. Her testimony is based on her service as a Borough Council member,

which ended in November of 2016—one year before Locke issued the Notice of Violation to the

plaintiffs. Durkin Dep. 34:25-35:5, 57:10-60:23. Accordingly, Durkin's testimony is

insufficient to create a genuine dispute of material fact regarding Pancoe's personal involvement

in the alleged retaliation against plaintiffs in 2017.

      There is no dispute that Locke issued, and subsequently reissued the Notice of Violation

to plaintiffs. The record demonstrates that Locke has discretion to issue a Notice of Violation

and may do so independently and without approval from the Borough Council or members of the

Borough Council. Locke Dep. 48:15-49:19; Pancoe Dep. 42:25-43:5, 52:13-17; Bunker Dep.

85:10-86:22. Specifically, Locke testified that it was his "call" to issue the Notice of Violation

to the plaintiffs. Locke Dep. 72:8-10. Additionally, Locke testified that he was not instructed to

reissue the Notice of Violation to plaintiffs. Locke Dep. 93:13-17. Pancoe also testified that

Locke did not seek her approval before he reissued the Notice of Violation to the plaintiffs.

Pancoe Dep. 134:14-21. On this issue, the Court concludes that Durkin's testimony on the way

Pancoe and Locke interacted in 2016—one year before Locke issued the Notice of Violation—is

not probative. In sum, there is no evidence that Pancoe was personally involved in the alleged

retaliation against plaintiffs. Accordingly, defendants' motion for summary judgment on

plaintiffs' First Amendment retaliation claim against Borough President Debora Pancoe in her

individual capacity (Count I) is granted.

### ii.    *Borough Council Vice President Richard Bunker*

With respect to Borough Council Vice President Richard Bunker, plaintiffs assert that

because Bunker made public statements opposing Ms. Downs' candidacy for mayor, he "was

supporting the decisions to prosecute Plaintiffs." Pls.' Resp. at 35. Therefore, according to

plaintiffs, he is personally liable under § 1983. *Id.* The Court disagrees.

As discussed *supra*, Locke has discretion to issue a Notice of Violation and may do so

independently without approval from the Borough Council or members of the Borough Council,

such as Vice President Bunker. Locke Dep. 48:15-49:19; Pancoe Dep. 42:25-43:5, 52:13-17;

Bunker Dep. 85:10-86:22. Further, Locke testified that he does not remember Bunker "ever

mention[ing] anything about issuing the Notice of Violation . . . to the [plaintiffs] prior to

[Locke] doing it." Locke Dep. 71:16-71:19. Plaintiffs, however, argue that Bunker's public

statements opposing Mrs. Downs' campaign for mayor is evidence that he "was supporting the

decisions to prosecute Plaintiffs." Pls.' Resp. at 35. But, plaintiffs fail to connect Bunker's

public statements opposing Mrs. Downs' campaign for mayor with Locke's decision to issue,

14

and subsequently reissue, the Notice of Violation to them. Making public statements' opposing

Mrs. Downs' campaign for mayor, without more, is not evidence of Bunker's personal

involvement in the alleged retaliation against plaintiffs. In sum, there is no evidence that Bunker

was personally involved in the alleged retaliation against plaintiffs.

Accordingly, defendants' motion for summary judgment on plaintiffs' First Amendment

retaliation claim against Borough Vice President Richard Bunker in his individual capacity

(Count I) is granted.

### iii. Borough Manager George Locke

Locke was personally involved in the alleged retaliation against plaintiffs because he

issued, and subsequently reissued, the Notice of Violation to the plaintiffs. Accordingly, the

Court must determine whether plaintiffs have met their burden of production with respect to their

First Amendment retaliation claim against Locke in his individual capacity.

To prevail on their First Amendment retaliation claim against Locke in his individual

capacity, plaintiffs must prove: "(1) constitutionally protected conduct, (2) retaliatory action

sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3)

a causal link between the constitutionally protected conduct and the retaliatory action."

*Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017) (quoting *Thomas v. Indep. Twp.*, 463 F.3d

285, 296 (3d Cir. 2006)). "A defendant may defeat the claim of retaliation by showing that it

would have taken the same action even if the plaintiff had not engaged in the protected activity."

*Eck v. Oley Valley Sch. Dist.*, No. CV 19-1873, —F. Supp. 3d.—, 2019 WL 6884668, at *9 (E.D.

Pa. Dec. 17, 2019) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.

2007)).

The Court notes that defendants did not argue that Locke's decision to issue, and

subsequently reissue, the Notice of Violation did not constitute a retaliatory action against

plaintiffs for (1) voicing their complaints at Borough Council about the manner in which Locke

and the Borough enforced the zoning code against the Glasses, (2) requesting public information

in the form of Right-to-Know requests, and (3) campaigning for mayor by Ms. Downs with her

husband's support. *See* Defs.' Mot. Summ. J. at 7-8, 12.[4]  Rather, defendants argue that there is

no causal connection between plaintiffs' protected conduct and Locke's claimed retaliatory

action. *Id.*  Accordingly, the Court limits its analysis to whether the plaintiffs have shown that

there was a causal connection between the plaintiffs' constitutionally protected conduct and

Locke's alleged retaliatory action.

To establish a causal link between an alleged retaliatory action and a protected activity,

"a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between

the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled

with timing to establish a causal link." *DeFlaminis*, 480 F.3d at 267.  In the absence of an

unusually suggestive temporal proximity between the protected activity and the allegedly

retaliatory action, or a pattern of antagonism coupled with timing to establish a causal link, a

plaintiff must "show that from the 'evidence gleaned from the record as a whole' the trier of the

fact should infer causation." *Id.*  "The required [causal] link is 'but-for' causation." *Mirabella,*

---

[4]         Nonetheless, the Court concludes that plaintiffs have satisfied that first two elements of their First
Amendment retaliation claim against Locke in his individual capacity.  As to the first element, plaintiffs exercised
their First Amendment rights—their right to free speech, to petition the government for redress of grievances, and
their right to political association—when they publicly criticized the failure of Locke and the Borough to enforce
the Zoning Code, requested public information, *see Mirabella*, 853 F.3d at 649, and when Ms. Downs sought
political office with her husband's support, *see Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214
(1986); *Pueschel v. Chao*, 955 F.3d 163, 169 (D.C. Cir. 2020).  As to the second element, Locke's act of, issuing
and subsequently reissuing, the Notice of Violation to plaintiffs, could constitute retaliatory action sufficient to deter
a person of ordinary firmness from exercising their constitutional rights. *See Majer v. Twp. of Long Beach*, No.
CIV.A.06-2919MLC, 2009 WL 3208419, at *5 (D.N.J. Sept. 30, 2009) (finding a genuine issue of material fact as to
whether township's conduct was retaliatory where plaintiff "was issued violation notices and a summons as to his
practice of posting 'Open House—For Rent' signs").

853 F.3d at 651 (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006). This inquiry is highly

context specific. *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

Importantly, the Third Circuit has stressed that "[a] court must be diligent in enforcing these

causation requirements because otherwise a public actor cognizant of the possibility that

litigation might be filed against him, particularly in his individual capacity, could be chilled from

taking action that he deemed appropriate and, in fact, was appropriate." *DeFlaminis*, 480 F.3d at

267.

The Court concludes that viewing the record as a whole, in the light most favorable to the

plaintiffs, they have presented sufficient evidence from which a jury could infer causation.  First,

Locke issued the Notice of Violation on December 7, 2017, one month after Ms. Downs'

campaign for mayor ended, and fifteen days after plaintiffs filed their most recent Right-to-Know

request, of which Locke testified that he was aware.[5]  Pls.' Ex. 15; Locke Dep. 116:10-21.  Thus,

there is a close temporal proximity between plaintiffs' protected conduct and Locke's allegedly

retaliatory actions, which is probative of causation.  *See Hammond v. City of Wilkes Barre*, 628

F. App'x 806, 808 (3d Cir. 2015) ("[T]wo weeks may be close enough temporally to be

probative of causation.").  Second, Locke testified that he "didn't enjoy" the way the plaintiffs

acted toward him with respect to their complaints about the Glasses.  Locke Dep. 84:24-85:17.

Third, Ms. Downs testified that Locke treated the plaintiffs differently than he treated the Glasses

with respect to his enforcement of the Zoning Code.  M. Downs Dep. 171:19-172:14.

Specifically, Ms. Downs stated that (1) Locke did not meet with the plaintiffs to discuss their

alleged violation of the Zoning Code, as he had done with the Glasses; (2) Locke did not

---

[5]      The Court notes that part of the delay resulted from Locke's decision to defer issuance of the Notice of
Violation during Ms. Downs' campaign for mayor.  He concluded that there was sufficient evidence to issue a
Notice of Violation to the plaintiffs in October 2017, during Ms. Downs' campaign for mayor.  *See supra*, Part II.

17

investigate plaintiffs' home, to determine whether they were in fact operating an impact business, as he had done with the Glasses; and (3) Locke did not give the plaintiffs an opportunity to abate their conduct, as he had done with the Glasses. *Id.*; Pls.' Ex. 2. On this issue, plaintiffs argue that Locke's failure to give plaintiffs the opportunity to voluntarily comply is significant because Locke testified that the Borough "look[s] for voluntary compliance," and "go[es] above and beyond trying to get voluntary compliance" with Notices of Violation. Locke Dep. 40:6-16. Finally, Locke testified that he "wasn't surprised" by the Zoning Hearing Board's decision in the plaintiffs' favor. Locke Dep. 128:24-129:2. The Court concludes that a reasonable jury considering this evidence could conclude that Locke issued, and subsequently reissued, the Notice of Violation to the plaintiffs in retaliation for their constitutionally protected conduct. This conclusion, however, does not end the Court's inquiry.

"A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Eck v. Oley Valley Sch. Dist.*, No. CV 19-1873, —F. Supp. 3d.—, 2019 WL 6884668, at *9 (E.D. Pa. Dec. 17, 2019). In their motion for summary judgment, defendants argue that Locke would have taken the same actions against plaintiffs even if they had not engaged in their protected activities. Defs.' Mot. Summ. J. at 10-11. Defendants also assert that "there is evidence to establish even probable cause" that plaintiffs violated the Zoning Code, which "defeats a First Amendment Retaliation Claim." *Id.* at 11 (citing *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019)). The Court will address each argument in turn.

First, defendants argue that, according to both Locke and Kilkenny, the evidence was sufficient to issue a Notice of Violation. Defs.' Mot. Summ. J. at 10. Defendants claim that Locke would have issued the Notice of Violation to the plaintiffs regardless of their protected

18

conduct.  But, Locke and Kilkenny's determination that the evidence was sufficient to warrant

issuance of a Notice of Violation was based on an alleged ruling by Judge McHugh that

interpreted the definition of an impact business under the Zoning Code in a way that

encompassed a broader range of activities.  Kilkenny Dep. 49:23-50:10; Locke Dep. 52:23-54:2.

Plaintiffs dispute the existence of such a ruling, and defendants have not presented any evidence

of the ruling—the record does not include copies of an order or a transcript, and Judge

McHugh's deposition was not taken.  Because defendants' argument that Locke would have

taken the same action even if the plaintiffs had not engaged in protected conduct is based on

Judge McHugh's challenged ruling, this defense presents a genuine issue of material fact, which

cannot be adjudicated on a motion for summary judgment.

      Second, defendants claim that "the photographs and videos evidencing commercial grade

landscaping equipment being moved from and to the [plaintiffs'] property on multiple occasions

was sufficient probable cause to issue the notice."  Defs.' Mot. Summ. J. at 11.  However,

"[b]ecause of its fact-specific nature, the existence or absence of probable cause is ordinarily a

question of fact appropriate for resolution by a jury."  *Adams v. Springmeyer*, 17 F. Supp. 3d

478, 495 (W.D. Pa. 2014); *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997) ("Typically,

the existence of probable cause in a section 1983 action is a question of fact.").  Nonetheless, "a

district court may conclude that probable cause exists as a matter of law if the evidence, viewed

most favorably to the Plaintiff, reasonably would not support a contrary factual finding, and may

enter summary judgment accordingly."  *Brantley v. Burrows*, No. CV 14-4185, 2015 WL

13620413, at *3 (E.D. Pa. Nov. 19, 2015); *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d

Cir. 2003).

The Court declines to determine whether, as a matter of law, there was probable cause for Locke to issue the Notice of Violation to the plaintiffs as a matter of law because the existence of probable cause depends on the definition of an impact business under the Zoning Code. And, as discussed *supra*, there is a question of fact as to whether Judge McHugh issued a ruling that expanded the definition of an impact business under the Zoning Code. Furthermore, defendants fail to include in the summary judgment record the "photographs and videos" that they rely on to argue that probable cause exists. *See* Defs.' Mot. Summ. J. at 11.

The Court concludes that a reasonable jury could find that Locke retaliated against plaintiffs because they exercised their First Amendment rights. The Court also concludes that the defendants have failed to show that Locke would have issued, and subsequently reissued, the Notice of Violation to the plaintiffs despite their constitutionally protected conduct. Additionally, the Court declines to determine as a matter of law whether there was probable cause to issue the Notice of Violation to the plaintiffs. The Court must now address whether Locke is entitled to qualified immunity.

Qualified immunity shields government officials performing discretionary functions from 42 U.S.C. § 1983 liability. *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 192 (3d Cir. 2005). However, qualified immunity does not apply if two conditions are met. *Id.* First, the plaintiff must allege facts that "make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, the "right at issue [must have been] 'clearly established' at the time of defendant's alleged misconduct." *Id.* "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). If officials could disagree regarding the legality of their conduct, then qualified immunity should be recognized.

*Malley v. Briggs*, 475 U.S. 335, 341 (1986) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

As discussed *supra*, plaintiffs have provided sufficient evidence of retaliation against them for exercising their First Amendment rights to warrant submission of that issue to the jury. Accordingly, the Court must determine whether the plaintiffs' First Amendment rights were clearly established at the time of Locke's alleged misconduct. *Reichle*, 566 U.S. at 664. Defendants argue that (1) Locke is entitled to qualified immunity because his actions did not violate plaintiffs' clearly established rights, and (2) Locke is presumptively entitled to qualified immunity because he relied on legal advice from Kilkenny. Defs.' Mot. Summ. J. 13-14 (citing *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d Cir. 2010)). The Court disagrees.

"[I]t is clearly established that 'the First Amendment prohibits [a public official] from retaliating against an individual for speaking critically of the government.'" *Blankenship v. Manchin*, 471 F.3d 523, 533 (4th Cir. 2006) (quoting *Trulock v. Freeh*, 275 F.3d 391, 406 (4th Cir. 2001)); *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 588 (6th Cir. 2008) ("[T]he right to criticize public officials is clearly protected by the First Amendment."); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."). Thus, the Court concludes that plaintiffs had a clearly established First Amendment right to voice their criticism of their local government's perceived failure to enforce the law. A reasonable public official in Locke's position would know that he could not retaliate against the plaintiffs for criticizing the Borough and Locke at Borough Council for failing to enforce the Zoning Code.

21

Moreover, the "right to seek political office . . . is undeniable." *Pueschel v. Chao*, 955

F.3d 163, 169 (D.C. Cir. 2020) (quoting *Branch v. F.C.C.*, 824 F.2d 37, 47 (D.C. Cir. 1987));

*Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ("[P]laintiff's interest in seeking office

was protected by the First Amendment."); *see also United States v. Tonry*, 605 F.2d 144, 150

(5th Cir. 1979) ("There is no question that candidacy for office and participating in political

activities are forms of expression protected by the first amendment."); *Savage v. Pennsylvania

Tpk. Comm'n*, No. 2:15-CV-6501, 2016 WL 3548436, at *8 (E.D. Pa. June 27, 2016) ("The

[Supreme] Court observed that there is a First Amendment interest in candidacy."). Because the

right to seek political office is so foundational to our system of government, every reasonable

official in Locke's position would know that they could not retaliate against the plaintiffs

because Ms. Downs ran for mayor. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials

can still be on notice that their conduct violates established law even in novel factual

circumstances."). Accordingly, Locke is not entitled to qualified immunity on plaintiffs' First

Amendment retaliation claim.

Nonetheless, defendants argue that Locke is "presumptively entitled" to qualified

immunity because he relied on Solicitor Kilkenny's legal advice regarding whether there was

sufficient evidence to issue the Notice of Violation to the plaintiffs. Defs.' Mot. Summ. J. at 15

(citing *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d Cir. 2010). First, as discussed

*supra*, Locke's reliance on Kilkenny's legal advice was based on Judge McHugh's ruling, as to

which there is a genuine issue of material fact. *See Monteiro v. City of Elizabeth*, 436 F.3d 397,

405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court,

when qualified immunity depends on disputed issues of fact, those issues must be determined by

the jury."). Second, defendant's argument is based on the Third Circuit opinion in *Kelly*, which

held "that a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." *Kelly*, 622 F.3d at 255-56. That case presents different concerns and is distinguishable from this case. Accordingly, the Court declines to extend the holding in *Kelly* to plaintiffs' First Amendment retaliation claim against Locke.

The Court concludes that plaintiffs' First Amendment right to criticize their local government's perceived failure to enforce the law, and Ms. Downs' First Amendment right to seek political office were clearly established at the time of Locke's actions. Accordingly, Locke is not entitled to qualified immunity. Defendants' motion for summary judgment on plaintiffs' First Amendment retaliation claim against Locke in his individual capacity (Count I) is denied.

### B. First Amendment Retaliation Claim Against the Borough Under § 1983 (Count I)

Under *Monell v. Department of Social Services*, a municipality cannot be held liable on a theory of *respondeat superior*. *Monell v. Dep't of Soc. Sevs.*, 436 U.S. 658, 691 (1978). Rather, a municipal entity is liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights. *Id.* at 694. An "official policy" is created not only by formal rules but also when the "government's authorized decisionmakers" make the "decision to adopt [a] particular course of action." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). A "custom" exists when a "widespread practice" is "so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal citations omitted).

In this case, plaintiffs claim that "Defendants Pancoe, Bunker and Locke" were the

"authorized decision makers for the Borough of Jenkintown." Pls.' Resp. at 41.  Thus, according

to plaintiffs, the alleged retaliatory actions of Pancoe, Bunker and Locke represent an official

Borough policy.  *Id.* at 42.  Plaintiffs also argue that the record "demonstrates that Defendant

Jenkintown Borough had a custom of selectively and sporadically enforcing" the property

maintenance code and the "zoning code[,] and used this custom to violate Plaintiffs'

constitutional rights."  *Id.* at 12, 41. The Court will address each argument in turn.

        i.    *First Amendment Retaliation Claim Based on an Official Borough Policy*

        Plaintiffs contend that "Defendants Pancoe, Bunker and Locke" were the "authorized

decision makers for the Borough of Jenkintown." Pls.' Resp. at 41.  Thus, according to

plaintiffs, the alleged retaliatory actions of Pancoe, Bunker, and Locke represent an official

Borough policy.  *Id.* at 42.  But, as discussed *supra*, plaintiffs' First Amendment retaliation

claim against Pancoe and Bunker in their individual capacities fail because they were not

personally involved in the alleged retaliation against the plaintiffs.  As such, plaintiffs' *Monell*

claim based on an official Borough policy predicated on Pancoe and Bunker's actions fails as a

matter of law. *See Zimmerlink v. Zapotsky*, 539 F. App'x 45, 50 (3d Cir. 2013) ("Because no

claims against the individual defendants survive, [plaintiff's] municipal liability claims against

the County were properly dismissed."); *Marable v. W. Pottsgrove Twp.*, 176 F. App'x 275, 283

(3d Cir. 2006) ("We further note that a municipality may not incur *Monell* liability as a result of

the actions of its officers when its officers have inflicted no constitutional injury.").

        The Court concludes that a reasonable jury could find that Locke retaliated against

plaintiffs because they exercised their First Amendment rights.  Thus, plaintiffs' *Monell* claim

predicated on Locke's actions is viable only if Locke was a policymaking official for the

Borough, which defendants' dispute.[6] *See Pembaur*, 475 U.S. at 481. The Court must determine whether there is evidence of record that Locke is a policymaking official.

"Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481; *Praprotnik*, 485 U.S. at 123. "The fact that a particular official—even a policymaking official— has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 482. "The question of who is a 'policymaker' is a question of state law." *Kelly*, 622 F.3d at 264-65 (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1481 (3d Cir. 1990)); *Praprotnik*, 485 U.S. at 124 ("We begin by reiterating that the identification of policymaking officials is a question of state law."). "In order to ascertain if an official has final policy-making authority, and can thus bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy in the particular area of municipal business in question, and (2) whether the official's authority to make policy in that area is final and unreviewable." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (internal marks omitted). Accordingly, the Court must determine whether, under Pennsylvania law, Locke is a policymaking official for the Borough in the area of zoning enforcement.

Pennsylvania law provides that, "[t]he council of a borough may, at its discretion at any time, create by ordinance the office of borough manager," whose powers and duties "shall be regulated by ordinance." 8 Pa. Cons. Stat. Ann. §§ 1141(a), 1142(a). However, the Jenkintown municipal ordinances were not made part of the summary judgment record in this case and

---

[6]     Plaintiffs did not argue, or submit any evidence, that Locke's actions were ratified by a policymaking official. *See Kelly*, 622 F.3d at 264 ("An employee who lacks policymaking authority can still bind the municipality if a municipal policymaker . . . ratified his decision."). Accordingly, the Court does not address whether Locke's actions were ratified.

"these documents are not 'readily available' such that the Court could take judicial notice of them." *Chirdon v. Borough of Plum*, 92 F. Supp. 3d 360, 365 (W.D. Pa. 2015) (quoting *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 321 (1st Cir. 2004). Therefore, the Court must analyze the record to determine whether Locke is a policymaking official in the area of zoning enforcement.

In this case, plaintiffs present no evidence that supports their assertion that Locke was a policymaker for the Borough. Specifically, there is no evidence of record that (1) Locke is responsible for making Borough policy in the area of zoning enforcement, or (2) that, even if Locke possesses authority to make policy, his authority is final and unreviewable. *See generally* Pls. Resp. 32-42. The record establishes that although Locke has discretion to enforce the Zoning Code, he does not make policy with respect to zoning enforcement. *See Pembaur*, 475 U.S. at 482 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Locke merely enforces the Zoning Code, which demonstrates that he is not an official policymaker in the area of zoning enforcement. *See Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004) ("The mere authority to implement pre-existing rules is not the authority to set policy.").

Moreover, even if Locke were responsible for making Borough policy in the area of zoning enforcement, the record illustrates that his authority would not be final and unreviewable. Plaintiffs admit that Locke "answers" to the Borough Council, Pls.' Resp. at 21, ¶ 76. Additionally, a Notice of Violation that Locke issues can be appealed to the Zoning Hearing Board. Locke Dep. 124:20-25, 128:8-12. Indeed, plaintiffs appealed the Notice of Violation at issue to the Zoning Hearing Board, and the Board reversed Locke's determination and found in

26

their favor.  Locke Dep. 128:8-12.  The fact that Locke "answers" to the Borough Council and

that his decisions can be appealed to the Zoning Hearing Board shows that even if Locke had

authority to make policy in the area of zoning enforcement, his authority was not final and

unreviewable.  The Court thus concludes that Locke is not a policymaking official for the

Borough in the area of zoning enforcement.  Plaintiffs have failed to meet their burden of

proving that any alleged First Amendment retaliation they suffered was the result of an official

Borough policy.

> ii.  *First Amendment Retaliation Claim Based on a Borough Custom of*
> *Selectively Enforcing the Property Maintenance Code and the Zoning Code*

In response to defendants' motion for summary judgment, plaintiffs argue that "[t]he

record evidence also demonstrates that [the Borough] had a custom of selectively and

sporadically enforcing" the property maintenance code and the "zoning code[,] and used this

custom to violate Plaintiffs' constitutional rights."  Pls.' Resp. at 35, 41.  The Court will address

each purported Borough custom in turn.

> a.  Borough Custom of Selectively Enforcing the Property Maintenance Code

Plaintiffs' argument that the Borough had a custom of selectively enforcing the property

maintenance code is based solely on the testimony of plaintiff, Mr. Downs.  *See* Pls.' Resp. at 12,

37-38.  Mr. Downs testified that he "think[s]" that the Borough selectively enforced the property

maintenance code.  D. Downs Dep. 154:7-15.  Further, plaintiffs in their response to Defendant's

Statement of Facts, stated that "Mr. Downs believes that the Borough selectively enforced

property and zoning code based upon his observation[s]" of properties supposedly in violation of

the property maintenance code that he thinks did not receive a property maintenance code

violation.  Pls.' Resp. Defs.' Statement Facts ¶ 24; D. Downs Dep. 153:1-155:24 ("There were

probably multiples, but I know there is a house down the street that the house is being overgrown

by the weeds and bushes and I don't think they got cited for that."). In sum, Mr. Downs'

testimony regarding a Borough custom of selectively enforcing the property maintenance code is

nothing more than mere speculation. Mr. Downs' speculation is insufficient to create a genuine

issue of material fact as to whether the Borough had a custom of selectively enforcing the

property maintenance code. *See Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("[A]n

inference based upon a speculation or conjecture does not create a material factual dispute

sufficient to defeat summary judgment."). Accordingly, the Court concludes that plaintiffs failed

to meet their burden of proving the existence of a Borough custom of selectively enforcing the

property maintenance code.

### b. Borough Custom of Selectively Enforcing the Zoning Code

Plaintiffs' argument that the Borough selectively enforced the Zoning Code is based on

their alleged "unfavorable treatment" by Locke when he enforced the Zoning Code against them

as compared to their neighbors—the Glasses. *See* Pls.' Resp. at 35-37. This assertion, that

plaintiffs were treated differently from their neighbors, could support a selective-enforcement

claim under the Equal Protection Clause of the Fourteenth Amendment. *See Dique v. New

Jersey State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (listing elements of a selective

enforcement claim under the Equal Protection Clause). However, plaintiffs did not plead a

selective-enforcement claim under the Equal Protection Clause of the Fourteenth Amendment in

the First Amended Complaint. *See* First Am. Compl. 9-12. Rather, the plaintiffs asserted a First

Amendment retaliation claim, *id.*, and in response to defendant's motion for summary judgment,

they argued that the Borough "had a custom of selectively and sporadically enforcing it (sic)

zoning code and used this custom to violate Plaintiffs' constitutional rights." Pls.' Resp. at 41.

To prevail on such a claim, plaintiffs must provide evidence of a "widespread [Borough]

practice" of selectively enforcing the Zoning Code. *See Praprotnik*, 485 U.S. at 127 (defining a "custom" as a "widespread practice").

A "custom" exists when a "widespread practice" is "so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnik*, 485 U.S. at 127.  While there is no bright line rule that establishes how widespread a practice must be in order to be considered a municipal custom, "[i]t is well established that 'proof of a single instance of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy (sic) can be attributed to a municipal policymaker.'" *Gwynn v. City of Philadelphia*, 866 F. Supp. 2d 473, 488 (E.D. Pa. 2012) (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 820 (1985)), *aff'd*, 719 F.3d 295 (3d Cir. 2013); *Brown v. City of Pittsburgh*, 586 F.3d 263, 292 (3d Cir. 2009).  Thus, a single incident of misconduct is insufficient to establish a municipal custom.  *See Praprotnik*, 485 U.S. at 127 (explaining that a custom is a "widespread practice"); *Crawford v. Van Buren Cty., Ark.*, 678 F.3d 666, 669 (8th Cir. 2012) ("Liability for an unconstitutional custom or usage, however, cannot arise from a single act."); *Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) (explaining that "a single incident—or even three incidents" does not constitute a widespread municipal custom or practice); *see also Solomon v. Philadelphia Hous. Auth.*, 143 F. App'x 447, 457 (3d Cir. 2005) ("A custom under *Monell* can usually not be established by a one-time occurrence.").

In this case, plaintiffs do not provide any evidence that the Borough selectively enforced the Zoning Code against other Jenkintown residents. Pls.' Resp. 35-37.  Rather, they attempt to prove the existence of a municipal custom based solely on one instance of Locke's alleged misconduct—his disparate treatment of the plaintiffs as compared to their neighbors. *See* Pls.'

Resp. 35-37. A single incident of misconduct is insufficient to prove the existence of a custom. *See Praprotnik*, 485 U.S. at 127. The Court thus concludes that plaintiffs failed to meet their burden of proving the existence of a Borough custom of selectively enforcing the Zoning Code.

      *iii.*    *Conclusion*

The Court concludes that plaintiffs' First Amendment retaliation claim against the Borough based on an official policy fails. Additionally, plaintiffs have failed to show that any alleged First Amendment retaliation they suffered was the result of a Borough custom. Accordingly, defendants' motion for summary judgment with respect to plaintiffs' First Amendment retaliation claim against the Borough (Count I) is granted.

### C. State Law Civil Conspiracy Claim Against Locke in his Official and Individual Capacity (Count III)

In their motion for summary judgment, defendants argue that plaintiffs "have offered no proof that Locke acted in conspiracy with the Borough Solicitor, Sean Kilkenny." Defs.' Mot. Summ. J. at 15. The Court agrees with defendants on this issue.

In Pennsylvania, "a civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Brown v. Everett Cash Mut. Ins. Co.*, 157 A.3d 958, 967 (Pa. Super. Ct. 2017) (quoting *Baker v. Rangos*, 324 A.2d 498, 506 (Pa. Super. Ct. 1974)). "Proof of malice, *i.e.*, an intent to injure, is essential in proof of a conspiracy." *Klein v. Madison*, 374 F. Supp. 3d 389, 432 (E.D. Pa. 2019) (quoting *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 547 Pa. 224, 235 (Pa. 1997)).

In their response to defendants' motion for summary judgment, plaintiffs did not address defendant's civil conspiracy arguments. They say nothing about an alleged conspiracy between Locke and Kilkenny in the response. Thus, plaintiffs have waived that claim. *See Mason v. Kruczaj*, No. CV 13-6512, 2016 WL 161594, at *8 (E.D. Pa. Jan. 13, 2016) ("[A] failure to

counter the defendant's challenges to the legal sufficiency of the plaintiff's claims 'constitutes an abandonment of these causes of actions and essentially acts as a waiver of these issues' by the plaintiff."); *Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) ("[W]hen a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues.'"). Nevertheless, the Court addresses the conspiracy argument on the merits.

Upon review of the record in this case, the Court concludes there is no evidence that Kilkenny and Locke conspired to retaliate against plaintiffs for exercising their First Amendment rights. The evidence shows that Locke sought legal advice from Borough Solicitor Kilkenny on the question whether the evidence against the plaintiffs was sufficient to issue a Notice of Violation to them for operating an impact business. Locke Dep. 63:8-15, 66:14-17; Pls.' Resp. at 29, ¶ 116. Plaintiffs have offered no evidence to the contrary.[7] Instead, they argue, without evidence, that Kilkenny gave Locke poor legal advice because Kilkenny wanted to punish the plaintiffs. Pls. Resp. at 34. This is not evidence of a conspiracy between Kilkenny and Locke. *See Brown*, 157 A.3d at 967 (stating that a civil conspiracy under Pennsylvania law requires a combination of two or more people). Accordingly, defendants' motion for summary judgment with respect to plaintiffs' state law civil conspiracy claim against Locke in his official and individual capacity (Count III) is granted.[8]

---

[7]     Ms. Downs testified that she "believe[s]" that Kilkenny conspired with Locke, and that she has a "suspicion" that Locke's actions were directed by Kilkenny. M. Down. Dep. 97:16-98:12. Ms. Downs, however, admitted that she does "not have any firsthand factual information" to support her beliefs. That testimony is insufficient to create a genuine issue of material fact with respect to whether Kilkenny conspired with Locke to retaliate against plaintiffs. *See Halsey*, 750 F.3d at 287.

[8]     Because the Court concludes that plaintiffs waived their Pennsylvania state law civil conspiracy claim, and that there is no evidence of a conspiracy between Kilkenny and Locke, the Court does not address defendants' arguments that Locke is entitled to governmental immunity under 42 Pa. Cons. Stat. § 8541 and official immunity under 42 Pa. Cons. Stat. § 8546(2).

## V.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part.  The Court grants that part of defendants' motion for summary judgment seeking to dismiss plaintiffs' First Amendment retaliation claim against Pancoe and Bunker in their individual capacities (Count I); plaintiffs' First Amendment retaliation claim against the Borough (Count I); and plaintiffs' civil conspiracy claim against Locke in his official and individual capacity (Count III).  The Court denies defendants' motion with respect to plaintiffs' First Amendment retaliation claim against Locke in his individual capacity (Count I).  The only remaining claim in the case is plaintiffs' First Amendment retaliation claim against Locke in his individual capacity (Count I).

An appropriate Order follows.

Exhibit "B"

Page 1

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

- - -

DAVID and MARGARET DOWNS        :     CIVIL ACTION
                                :
        vs.                     :
                                :
BOROUGH OF JENKINTOWN,          :
et al                           :     18-CV-4529

- - -

Deposition of DEBORRA SINES PANCOE,
taken pursuant to notice at Jenkintown Borough Hall,1
700 Summit Avenue, Jenkintown, Pennsylvania, beginning
at 9:38 A.M., on Wednesday, May 15, 2019, before
Nicholas DiPiero, Registered Professional Reporter and
Notary Public.

- - -

DIPIERO COURT REPORTING
Registered Professional Reporters
429 South 16th Street
Philadelphia, PA 19146
(215) 735-8101

DEBORRA SINES PANCOE

25 (Pages 94 to 97)

Page 94

1 that he needed to set up a meeting with the Downs and
2 that was -- Mr. Locke's practice is to meet with
3 people before he issues a violation and to follow it
4 up with a letter so that was.
5 Q.      My follow-up question to that which I asked
6 earlier, do you know if he ever met with them before
7 he issued the Notice of Violation?
8 A.      I think he did.
9 Q.      Did he ever report back to you on that
10 meeting and tell you the results of that meeting?
11 A.      I'm trying to remember. I'm going to say
12 that he would tell me that the meeting occurred.
13 Q.      I don't want to his practice. I want to know
14 your specific recollection.
15 A.      I'm sorry. I just don't have a specific
16 recollection.
17 Q.      So you don't have a recollection of him
18 coming back to you and saying hey, I met with the
19 Downs and discussed the allegation of whether they
20 were operating an impact business; is that correct?
21 A.      I'm sure he must have discussed it with me
22 but I do not recall what he said.
23 Q.      Between October of '16 and October of '17 did
24 you have ever have an understanding as to the Downs'
25 position on whether they were operating an impact

Page 95

1 business?
2 A.      Between '16 and '17?
3 Q.      Yes. During that October '16 to '17 did you
4 ever have an understanding as to the Downs' position
5 on whether they were operating?
6 A.      No. No.
7 Q.      Did anybody ever say to you that or
8 communicate to you that the Downs absolutely denied
9 that they were operating an impact business?
10 A.      Did anyone communicate to me that the Downs'
11 denied.
12 Q.      Operating an impact business.
13 A.      Yes.
14 Q.      Who communicated that to you?
15 A.      Everyone that came to the public meeting.
16 Q.      Which public meeting are you referring to?
17 A.      I will say maybe the October 2017 BZ&R
18 meeting.
19 Q.      How about before that, how about in late '16
20 or early '17, did any neighbors ever come and say that
21 the Downs don't operate a business?
22            MS. McDONOUGH: A business or an
23 impact business?
24 Q.      An impact business.
25 A.      I don't recall it being a topic of

Page 96

1 conversation.
2 Q.      How about, did anybody ever come and say they
3 didn't operate any business at all out of their house?
4 A.      Did any --
5 Q.      Yeah. During that same time did any resident
6 or Borough member ever come to you and say the Downs
7 don't operate a business?
8 A.      Once the violation notice was issued many
9 people said that to me.
10 Q.      I'm talking about before that.
11 A.      Before that it was not a topic of
12 conversation.
13 Q.      So this is why I'm trying to be careful with
14 my questions and I have to repeat them because I
15 interpret your previous answer to be that prior to the
16 notice being issued that many people came to a meeting
17 and said that the Downs don't operate a business,
18 impact or other?
19 A.      No. They came to the meeting in response to
20 that.
21 Q.      To the notice?
22 A.      Yes.
23 Q.      Do you know and just so the record is clear,
24 the first allegations of a business, an impact
25 business being operated by the Downs was in October as

Page 97

1 far as I know of '16.
2 A.      Of '16?
3 Q.      Your attorney may think it's September of
4 '16.
5            MS. McDONOUGH: It was '16.
6 A.      Of the Downs' operating a business?
7 Q.      Yes.
8 A.      That was the first complaint.
9 Q.      The first complaint I'm aware of by the
10 Glasses was in October of '16.
11 A.      Okay.
12 Q.      So a whole year goes by.
13 A.      I'll take your word. You looked at the
14 papers.
15 Q.      So a whole year goes by.  All right.
16 A.      Okay. Oh, no. The Downs operating a business.
17 Q.      Downs.
18 A.      You're saying that was in September of 2016.
19 Q.      I believe it was October of '16.
20            MS. McDONOUGH: The Fall of '16.
21 A.      The Fall of 2016.
22 Q.      I want October. That's my understanding. So
23 in the year that follows that did anyone ever come up
24 to you either through Borough Council meetings or
25 privately or in committee meetings and say, the Downs

DEBORRA SINES PANCOE

Page 106

1  Q.      Give me a specific reference of what you're
2  referring to.
3  A.      So she was discussing the Downs' zoning
4  dispute with the Glass family as part of the campaign.
5  Q.      So that's not a zoning decision. That's a
6  dispute between neighbors; isn't it?
7  A.      I believe it was a zoning question.
8  Q.      Well, had the Glasses had any matter before
9  the Zoning Hearing Board either in '16 or '17 that
10 you're aware?
11 A.      The Glasses did not bring the matter to the
12 Zoning Hearing Board.
13 Q.      Then what was wrong with Ms. Hull discussing
14 the issue between the Glasses and the Downs?
15 A.      The Downs were bringing the matter to the
16 Zoning Hearing Board.
17 Q.      That was in 2018 they did that. Let me help
18 you.
19 A.      Maybe I have the timeline wrong.
20 Q.      Let's get a couple facts straight here. Would
21 you agree that you would have had this discussion with
22 Ms. Hall in December of '17 at the end of the year?
23 A.      I don't think it was in December. I think it
24 might have been in January or February. I don't recall
25 the date.

Page 107

1  Q.      When would the new Zoning Hearing Board get
2  sworn in typically?
3  A.      It rotates throughout the year. There's no
4  set timeframe.
5  Q.      So I presumed then it's done on an individual
6  basis. If a new Zoning Hearing Board member is
7  appointed then shortly thereafter they're sworn in or
8  is there some kind of ceremony?
9  A.      Yeah. We vote about it. I guess -- do they
10 get sworn in? I'm not sure if they get sworn in.
11 Q.      Maybe they don't. I assumed that but maybe
12 they don't.
13 A.      Yeah.
14 Q.      Do you have a specific recollection of when
15 you informed Ms. Hull that she would not be
16 reappointed?
17 A.      I don't remember the date. So it must have
18 been after the election though because that was when
19 Dave would have stepped down and so we had a vacancy
20 and so we were thinking about filling vacancies and
21 looking at terms and whose term had expired.
22 Q.      Did Ms. Hull express to you that she wanted
23 to remain on the Zoning Hearing Board?
24 A.      She said she enjoyed the work.
25 Q.      She's an attorney, correct?

Page 108

1  A.      She is.
2  Q.      I think you said there were two reasons. What
3  was the other reason why you were not reappointing Ms.
4  Hull?
5  A.      Well, I hate to sound like I'm forcing it off
6  on someone else but Ms. MacHaffie was very concerned
7  that if a member of the Democratic party was not
8  supporting the endorsed candidate and was in fact
9  supporting a write-in candidate that that was
10 challenging to the Democratic party. I myself did not
11 express that view. I was listening to that view?
12 Q.      Would you agree that Ms. Downs ran as a
13 Democrat in her write-in candidacy?
14 A.      That's a really good question.
15 Q.      Or was a Democrat at the time she began her
16 write-in candidacy?
17 A.      I think she was a Democrat at the time but I
18 think she was not a Democrat before that.
19 Q.      Before when?
20 A.      Before that election season.
21 Q.      So is it your understanding she changed her
22 registration to Democrat to run as a write-in
23 candidate?
24 A.      I believe so.
25 Q.      Do you know how it came to be or the process

Page 109

1  in which the Downs were provided the Notice of
2  Violation?
3  A.      The process of the Downs' --
4  Q.      How they received the notice. Let me ask it.
5  Do you know how they received the Notice of Violation?
6  A.      I believe they got a letter.
7  Q.      Do you know how that letter was delivered?
8  A.      I do not.
9  Q.      Did you ever instruct Mr. Locke to hand
10 deliver the Notice of Violation to the Downs?
11 A.      I did not instruct him of that.
12 Q.      Do you know if Kilkenny instructed him to do
13 that?
14 A.      I could not say now.
15 Q.      Do you know if anyone instructed him to do
16 that?
17 A.      I don't know.
18 Q.      Do you know if he in fact did hand deliver
19 the Notice of Violation to the Downs?
20 A.      The more you say hand delivered the more I
21 think oh, maybe he did that. I don't know.
22 Q.      Is it typical process to mail it?
23 A.      I think they go certified, yeah.
24 Q.      Through the mail?
25 A.      Yes.

DEBORRA SINES PANCOE

Page 146

1  Borough received were from the Glasses about the
2  Downs?
3  A.    Well, that's my recollection.
4  Q.    Mr. Riley may have also chimed in also?
5  A.    I was going to say, yeah.
6  Q.    The landlord may have chimed in; would you
7  agree?
8  A.    Yes. I have heard that Mr. Riley.
9  Q.    Read the last paragraph of the last page. I'm
10 going to read the first sentence. "Under these
11 conditions as the standard to determine if a business
12 is being operated has been redefined due to recent
13 legal cases and rulings, the Borough must make their
14 determination based on the new redefined standard."
15        Did he explain to you what the new
16 and redefined standard was?
17 A.    Yes.
18 Q.    And what is it?
19 A.    That on the basis of these complaints he was
20 going to proceed with the violation notice.
21 Q.    Well, that's not the standard. I want to
22 know what the new standard was that led him to believe
23 that there was a violation. You said he explained it.
24        MS. McDONOUGH: You're asking her a
25 legal question.

Page 147

1  Q.    I'm asking her her understanding and that's
2  all I asked.
3  A.    I couldn't answer the question.
4  Q.    Did you question him about the new standard
5  when he stated that there was a new standard?
6  A.    I did not. I suppose I was negligent in that
7  regard.
8  Q.    I don't know. Did you question Mr. Kilkenny
9  about that?
10 A.    No.
11 Q.    Had you assumed that Kilkenny and Locke had
12 already discussed that based on the contents of this
13 memo?
14 A.    I assumed that our manager consults with the
15 attorney when he is issuing these kinds of zoning
16 matters. Especially when they are highly contended.
17 Q.    Does Mr. Locke have permission speak to the
18 Solicitor at any time?
19 A.    Yes.
20 Q.    Does that come from you or is that standard
21 operating practice?
22 A.    I don't know the answer to that question.
23 Q.    But you yourself have instructed him if he
24 needs guidance he's allowed to communicate with Mr.
25 Kilkenny?

Page 148

1  A.    Yes.
2  Q.    Does Mr. Kilkenny typically report to you or
3  summarize to you his conversations and advise provided
4  to Mr. Locke when they communicate?
5  A.    Mr. Kilkenny submits official monthly reports
6  and he gives us a bill.
7  Q.    I understand that. He gives those to the
8  Borough. I'm asking you if he specifically
9  communicates with you in an informal way about issues
10 that he discusses with George Locke?
11 A.    No.
12 Q.    Has he ever done that?
13 A.    Only if I ask him.
14 Q.    And did you ever ask him with regard to this
15 issue?
16 A.    No.
17 Q.    When I say issue I mean the issuance of a
18 Notice of a Violation against the Downs for operating
19 an impact business?
20 A.    I recall one phone conference with Mr.
21 Kilkenny.
22 Q.    Who was in on the conference?
23 A.    Him and I think George might have been in on
24 that phone conference and I was asking about the
25 contents of this, helping me to understand it.

Page 149

1  Q.    So you have a specific recollection of
2  speaking with George and Mr. Kilkenny about Exhibit
3  Pancoe 2, the contents of Exhibit Pancoe 2?
4  A.    No. Not the specific memorandum. I think
5  the specific memorandum was given to all Council
6  members. When I got it I just wanted to make sure I
7  understood.
8  Q.    I want to go back to the appointment of
9  Zoning Board hearing members. Has there ever been a
10 time since you've been on Council that Borough Council
11 did not approve of a candidate who's recommended by
12 the vacancy committee for the Zoning Hearing Board?
13 A.    Good heavens. I can't recollect any such
14 time.
15 Q.    When the vacancies occurred in '17 with Hull
16 and was it Ballard?
17 A.    Okay. Yes.
18 Q.    Was it up to the vacancy committee to put
19 forth those names as to who would be recommended to
20 Borough Council and then for Borough Council to
21 subsequently voted on them?
22 A.    Yes. And I will remind you that we
23 interviewed people and other members of Council were a
24 part of those interviews.
25 Q.    They would sit in from time to time?

DEBORRA SINES PANCOE

Page 150

1  **A.    Yes.**
2  Q.    Did you ever instruct Mr. Locke not to
3  provide a Notice of Violation to the Downs' until
4  after the November 7, 2017 election?
5  **A.    I had that discussion with Mr. Locke.**
6  Q.    What did you tell him?
7  **A.    I said it would be better not to do a**
8  **violation before the election.**
9  Q.    And why is that?
10 **A.    Because I didn't want there to be a**
11 **perception that we were trying to interfere with**
12 **Peggy's opportunity to campaign and run for election.**
13 Q.    Would you agree that that could have had a
14 backlash effect on Ms. Dobbs' campaign?
15 **A.    I would not state it that way.  I think it**
16 **would have been -- I don't know what kind of effect. I**
17 **just didn't want Peggy to be upset that we were trying**
18 **to get in the way of her running for mayor.**
19 Q.    At the time the Borough noticed the Downs did
20 you take, and this would have been I guess December
21 7th of '17.  Did you have any communications with
22 George or with Mr. Kilkenny and if Mr. Kilkenny wants
23 her deemed privileged then don't tell me what you
24 said. I just want to know if you had communications
25 about this topic.  Concerns about whether or not the

Page 151

1  Borough was treating the Downs differently than they
2  had treated the Glasses?
3  **A.    Did I have concerns about that?**
4  Q.    Did you have communications with Mr. Locke
5  and/or Kilkenny about those concerns?
6         MS. McDONOUGH: Objection. If she had
7  any concerns.
8  Q.    Assuming you had any.
9  **A.    Yeah.  I was not concerned that there was**
10 **uneven treatment. George in fact was making sure that**
11 **there was even treatment.**
12 Q.    Did you do anything to insure that George was
13 treating the Glasses and the Downs equally because you
14 were concerned that maybe that wasn't happening?
15        MS. McDONOUGH: Objection.  She said
16 she was not concerned and you keep putting in your
17 question because you were concerned.
18        MR. FOX: Well, she told me that
19 George, she believed George was doing.
20 Q.    I'm asking you if you had concerns separate
21 from George.
22 **A.    No.  I was not concerned that they were being**
23 **treated differently.**
24 Q.    Now, you sat through all three zoning
25 hearings with the Downs?

Page 152

1  **A.    Yes.**
2  Q.    Did you still have the same conclusion after
3  those zoning hearings?
4  **A.    Yes.**
5  Q.    I'm handing you Exhibit Pancoe 3 and it's an
6  e-mail from George Locke to Ben Sanchez. Do you know
7  who Ben Sanchez is?
8  **A.    I do.**
9  Q.    Who is he?
10 **A.    I think at the time he was a commissioner for**
11 **Abington Township.**
12 Q.    Will you please read the first page and then
13 I have some questions for you. You know what, before
14 you read the first page why don't we go back at the
15 second page.  And you can start at the top where you
16 see the hi, George.  Read that to yourself so you
17 understand who George is replying to.
18 **A.    Okay.**
19 Q.    Have you ever seen this before?
20 **A.    No.**
21 Q.    Would you generally agree with the comments
22 that Mr. Locke makes in this E-mail?
23        MS. McDONOUGH: Objection.
24 **A.    Give me a specific comment.**
25 Q.    First one, the residents of 301 Runnymede

Page 153

1  vehemently object to the presence of the neighbor at
2  301 Runnymede due to his status.
3  **A.    I would agree with that.**
4  Q.    And what do you think he meant by status?
5  **A.    Well, there's two meanings for the status.**
6  **One is the operation of a business and then the other**
7  **is that he a registered sex offender.  And that has**
8  **been made well -- we have been made aware -- we in**
9  **Council have been made aware of that by the Downs.**
10 Q.    The next sentence, they filed a stack of
11 reports that the neighbor was running a business to
12 have him zoned out.  Would you agree with that?
13        MS. McDONOUGH: Are you going to read
14 this entire memo that she's never seen before and ask
15 her --
16        MR. FOX: Well, you objected to my
17 first question.
18        MS. McDONOUGH: I don't think it's
19 appropriate questioning at a deposition.
20        MR. FOX: Your objection is noted.
21 She's been working with the guy for ten years.
22        MS. McDONOUGH: Pardon me? I didn't
23 hear what you said.
24        MR. FOX: She's been working with Mr.
25 Locke for ten years or so.

Exhibit "C"

Rick Bunker if it is about the Glass/Downs war, well, a few things:

- It isn't my ward
- Council sets the code, but isn't involved in citations etc.
- I thought that the citation against the Glass family, claiming he ran a business out of his house was silly, too.
- And I think the citation against the Downses is silly if it were in a vacuum. BUT he who lives by the sword dies by the sword. And they pushed and pushed and pushed until they got Glasses cited for basically the exact same thing. So how would it be fair not to cite them for the same thing when the Glasses complained?
- If being a contractor or tradesperson and keeping tools in your garage and driving to work with them is a problem, then a TON of us in the borough are in trouble. I don't think it is. But again, the Downses set the standard with their complaint against the Glasses, and I guess what's good for the goose is good for the gander.
- and finally, its my understanding that if you get a zoning citation, all you have to do is write a letter saying "sorry I will stop" and the process is done. Why the Downses are turning this into a federal case is beyond me. But I could be wrong, like I said on council we don't do enforcement.

Like · Reply · 26w · Edited

 Linda McGrath Rick Bunker : Why do you refer to this issue as the Downs' /Glass war? I went back to read council meeting minutes a bit ago when I started to read Peggy's post (re: this citation). They went back several years and the complaints were real and serious (and even acknowledged by council members). Many residents were very disturbed and voiced complaints and I see Brad Beck has made several comments here (on the meeting info thread) about the hearing last evening, even indicating he was not permitted (legally) to say much out here but anyone can see / hear his life was made miserable due to the situation going on @ Downs' neighbor's residence. I've also read many posts from people who live on Leedom Street where the family lived before re: their fear (and yes one person used that kind of strong word) and intimidation, the biz operations.....going on there as well. So, why are you saying ONLY the Downs' name and why call it SILLY? Is it silly that so many people have been so effected. I dare say these residents didn't think end don't think it's silly. ??

I posted before after reading minutes from a very early on council meeting, that it seemed to me that action was not taken swiftly enough or adequately enough and THAT IS or seems to me to be ...the reason for that "war" if you want to call it that. As I said before, I don't know who dropped what ball, but it was my impression that balls were dropped. You can try to humiliate me with your words/ response if you want but that was / is my impression.

Like · Reply · 26w · Edited



Rick Bunker Linda McGrath I have mentioned bothe the Peggy McGrath Downs issues, and the Glass issues, because they are inextricably linked.

The Downses started complaining about the Glasses the day they moved in. In fact they had a meeting about "dealing" with ... See More

Like · Reply · 26w · Edited

Denise Barrett Sobo Rick Bunker Although many entries have been "changed" since complaints started, just google the Glass business and some entries still have the Runnymede address listed as his business address. The complaints were not "silly" against Glass, but are you admitting that they are "silly" against the Downs?

Like · Reply · 26w

Denise Barrett Sobo I have to say that I am beyond disappointed not only with Locke's testimony last night but with his lack of follow up. From his own testimony, he only did a couple of "drive by's (that were not documented) and determined that the violation was warranted.

Like · Reply · 26w · Edited

GROUP BY

 Jenkintown House & Apartment C
55 like this

Send Message

ADD MEMBERS

Enter name or email address...

MEMBERS                          3,031 Members


SUGGESTED MEMBERS                          Hide
Friends

 Caitlin Furlong          Add Member

Victoria Ballantine          Add Member

Lara Joan          Add Member

See More

DESCRIPTION

Jenkintowns Community Page

Where we can post happenings, quest...
See More

GROUP TYPE

Neighbors

LOCATION

 Jenkintown, Pennsylvania

This location is set based on your group's name

BRING PEOPLE TOGETHER

Groups are separate spaces where you can share photos and make plans with just the people you want.

Create a Group

RECENT GROUP PHOTOS          See All

 

Suggested Groups          See All


No High Density Apartments at the ...!!!

R.O.A.R.Z. Residents of Abington for Responsible...          Join
235 members

Chat (Off)

Like · Reply · 26w

 **Denise Barrett Sobo** Rick Bunker Neither one of us are
trying this case, but if you call a complaint "silly", I will note
that there were many similar complaints from more than one
person. Could you clarify your comments? Are you saying
that the Downs were asked to change something and didn't
do it? Testimony last night showed that the Downs were
never spoken to. They also asked for an inspection several
times that never happened.

Like · Reply · 26w                                                    2

 **Randy Cance** The inspections that did take place were
"drive-bys".

Like · Reply · 26w                                                    1

 Rick Bunker In my personal opinion, not having been closer
to the whole stinking mess than I could possibly help, but
having been subjected to hours of the Downses reading
statements to council about enforcement that it is the police
and zoning officials' responsibility to enforce, not council's, I
think that the Glasses citation was pretty weak, and that the
Downses citation is pretty weak. And I think that if the
Downses hadn't pushed so hard neither of the citations would
ever have been written. And I think that once the Downses
pushed hard enough to get the weak citation written against
the Glasses, that they shouldn't act so stunned that the
borough had to give the same weight to the Glasses
complaints.

The citation isn't a finding of guilt, by the way. It just says you
have to go the the ZHB, or just to court. It is like a speeding
ticket. You still get to see the judge. The cop just makes you
take it to the judge.

Like · Reply · 26w

 **Randy Cance** If you had a neighbor making threats to you
every morning you got into your car to go to work, you don't
think that you might seek out the help of the borough? OH, I
forgot! You own a gun, so you could have just used PA's
"Stand Your Ground" laws and shot the guy. Should the
Downses have just bought a gun and left you all alone?

Like · Reply · 26w                                                    2

 **Denise Barrett Sobo** Rick Bunker hmm... that's an
interesting perspective.

Like · Reply · 26w                                                    1

**Rick Bunker** Randy Cance I would call the police. Which
they did. And he was charged. And he went to jail.

Like · Reply · 26w                                                    3

**Randy Cance** The Downses did call the police. In fact, I met
Peggy Downs for the first time at a Council Meeting where
we she went on for some time describing the threats. I
listened in amazement wondering why the police didn't just
park a car out there in the morning and arrest Glass as soon
as he started with his threats.

Instead, I got to hear Council and Sean Kilkenny blather on
for another half-hour about what little they could actually do.
In the midst of that, George Locke kept telling them that his
hands were tied. Everyone's hands were tied.

My understanding of the situation, Rick Bunker, is that the
Downses finally went over the head of the Borough and
privately filed criminal charges against their neighbors out of
frustration with the Borough's hands being so tied. Nice work,
Borough.

A neighbor comes to you for help, and you do nothing. Then
they make you look bad, and you go after them. Boy, does
that sound familiar.

Like · Reply · 26w                                                    3

**GROUP BY**

 Jenkintown House & Apartment C
55 like this

Send Message

**ADD MEMBERS**

Enter name or email address...

**MEMBERS**                              3,031 Members

**SUGGESTED MEMBERS**                    Hide
Friends

 Caitlin Furlong           Add Member

Victoria Ballantine                      Add Member

Lara Joan                                Add Member

See More

**DESCRIPTION**

Jenkintowns Community Page

Where we can post happenings, quest...
See More

**GROUP TYPE**

Neighbors

**LOCATION**

 Jenkintown, Pennsylvania

This location is set based on your group's name

**BRING PEOPLE TOGETHER**

Groups are separate spaces where you can
share photos and make plans with just the
people you want.

 Create a Group

**RECENT GROUP PHOTOS**              See All

 

**Suggested Groups**                 See All

 No High Density
Apartments at the

R.O.A.R.Z. Residents of Abington
for Responsible...                   Join
235 members

Chat (Off)

# Exhibit "D"

**George Locke**

EXHIBIT
K-1
7-9-19 M

| | |
|---|---|
| **From:** | George Locke |
| **Sent:** | Wednesday, November 01, 2017 7:06 PM |
| **To:** | Deborra Sines-Pancoe; Sean Kilkenny; Anthony Ciuca |
| **Cc:** | Richard Bunker; Jay Conners; Kieran Farrell |
| **Subject:** | RE: 301 Runnymede Complaint Summary |

Hello Deborra (all),

I have already met with Sean and Tony. The next steps are defined. As Sean stated the next step will be to issue the Violation letter that I drafted. As directed I will be holding off on sending that letter until after the election. We have offered to meet with the Downs' to discuss the complaints. That offer will still be in the Violation letter as well as the need to stop the actions shown in photos.

I have no doubt the actions depicted in the photos will stop for the time being as the grass cutting etc. is a seasonal activity.

As far as Council Leadership support - I have no further support to request at this time. I suspect that I will be needing support once the Violation letter is issued.

Thank you and talk soon
George Locke
Borough Manager
Jenkintown Borough
(O) 215 885 0700
(C) 610 636 3540
(E) glocke@jenkintownboro.com

**From:** Deborra Sines-Pancoe
**Sent:** Wednesday, November 01, 2017 11:15 AM
**To:** George Locke <glocke@jenkintownboro.com>; Sean Kilkenny <sean@skilkennylaw.com>; Anthony Ciuca <tony@skilkennylaw.com>
**Cc:** Richard Bunker <rbunker@jenkintownboro.com>; Jay Conners <jconners@jenkintownboro.com>; Kieran Farrell <kfarrell@jenkintownboro.com>
**Subject:** Re: 301 Runnymede Complaint Summary

George,

Thank you for putting together and sharing this comprehensive memo.
What next steps are you planning? Do you have a meeting set up with Sean/Anthony to define next steps?
What support would you like from Council leadership regarding this case?
I have time either early Thursday morning (11/2) or Friday morning (11/3) if you wish to talk.
Deborra

**From:** George Locke <glocke@jenkintownboro.com>
**Date:** Tuesday, October 31, 2017 at 4:29 PM
**To:** Sean Kilkenny <sean@skilkennylaw.com>, Anthony Ciuca <tony@skilkennylaw.com>
**Cc:** Deborra Sines Pancoe <dsinespancoe@jenkintownboro.com>, Richard Bunker <rbunker@jenkintownboro.com>, Jay

1

**Kelly Scarboro**

EXHIBIT
K-2
7-9-19

| | |
|---|---|
| **From:** | Sean Kilkenny <sean@skilkennylaw.com> |
| **Sent:** | Monday, October 16, 2017 5:20 PM |
| **To:** | George Locke; Richard Bunker |
| **Cc:** | Anthony Ciuca; Jay Conners; Kieran Farrell; Deborra Sines-Pancoe; A MacHaffie; J Lugar |
| **Subject:** | RE: Downs meeting request |

Rick: It was my suggestion that we meet with them (the Downs). I did so because I prosecuted the case in front of Judge McHugh and wanted to bring to their attention that the complaints may result in George issuing a citation and that they should cease.

Best,
Sean

**Sean P. Kilkenny**
The Law Offices of Sean Kilkenny, LLC
17 E. Airy St.
Norristown, PA  19401
sean@skilkennylaw.com
Office Phone:  484-679-8150
Direct Dial:   484-679-8153
Cell: 267-625-6393
Fax: 484-674-7584



**THE LAW OFFICES OF**
**SEAN** KILKENNY

CONFIDENTIALITY NOTICE:
The information contained in this electronic mail transmission (including any accompanying attachments) is intended solely for its authorized recipient(s) and may contain attorney/client privileged communications and confidential business information. If you are not the intended recipient, you have received this transmission in error and are hereby notified that reading, disclosing, distributing, printing, copying or any other use of this electronic mail message is prohibited. If you receive this electronic mail message by mistake, please immediately notify the sender and delete the original and all copies of this transmission (including any attachments) without reading, saving, copying or disclosing it.


RIGHT TO KNOW DISCLAIMER:
E-mail communications concerning agency business are considered to be public records pursuant to the Pennsylvania Right to Know Law (the "RTKL"), unless exempt in accordance with the provisions of the RTKL, and are therefore not considered confidential. E-mail communications sent or received by this office, relating to business conducted by any "agency" as defined in the RTKL, are therefore considered public records unless specifically exempt under the RTKL.

**From:** George Locke [mailto:glocke@jenkintownboro.com]
**Sent:** Monday, October 16, 2017 5:02 PM
**To:** Richard Bunker <rbunker@jenkintownboro.com>
**Cc:** Anthony Ciuca <tony@skilkennylaw.com>; Jay Conners <jconners@jenkintownboro.com>; Kieran Farrell <kfarrell@jenkintownboro.com>; Deborra Sines-Pancoe <dsinespancoe@jenkintownboro.com>; A MacHaffie <amachaffie@jenkintownboro.com>; J Lugar <jlugar@jenkintownboro.com>; Sean Kilkenny <sean@skilkennylaw.com>
**Subject:** RE: Downs meeting request

1

I have not met with a party who was being accused of running a business previously. I have communicated with residents as I did Glass by phone. I did communicate this complaint to Mr Downs by phone and he stated it was not true. In discussing this particular complaint, it was suggested that we should meet with them.

**From:** rick@bunkerplanet.com [mailto:rick@bunkerplanet.com] **On Behalf Of Rick Bunker**
**Sent:** Monday, October 16, 2017 4:25 PM
**To:** George Locke <glocke@jenkintownboro.com>
**Cc:** Anthony Ciuca <tony@skilkennylaw.com>; Jay Conners <jconners@jenkintownboro.com>; Kieran Farrell <kfarrell@jenkintownboro.com>; Deborra Sines-Pancoe <dsinespancoe@jenkintownboro.com>; A MacHaffie <amachaffie@jenkintownboro.com>; J Lugar <jlugar@jenkintownboro.com>; Sean Kilkenny <sean@skilkennylaw.com>
**Subject:** Re: Downs meeting request

Is such a meeting normal in a situation like this?

On Oct 16, 2017 3:38 PM, "George Locke" <glocke@jenkintownboro.com> wrote:

Good morning Solicitors (all),

I spoke to Dave Downs concerning the meeting we have proposed to discuss the complaints filed stated they are running a business out of their residence at 301 Runnymede Avenue. He stated they can make a 6:00 PM meeting on October 23rd prior to the Council meeting. If you are available, I told Dave I would send an invitation confirming the meeting as set.

Additionally, on Friday I received bank statements showing he paid the Downs family for landscape services. Mr. Reilly followed up with a phone call to tell me the information attached to this email woas being sent, he requested it be read at a public meeting as he was out of country and could not attend. I did not include them on this email but can provide them under separate cover.

Today I received the attached letter and photos from Mr. Reilly, he would like them entered in to record. The personal letter speaks for itself. The pictures appear to depict Mr. Downs loading landscaping equipment on to a truck and later performing landscaping work at another residence.

I look forward to hearing back from you on this. I have also Cc'd Council leadership and Council ward members from the affected ward to keep them in the loop.

Thank you and talk soon

George Locke

Borough Manager

Jenkintown Borough

(O) 215 885 0700

(C) 610 636 3540

**Kelly Scarboro**

EXHIBIT
K-3
1-9-19

| From: | Sean Kilkenny <sean@skilkennylaw.com> |
|---|---|
| Sent: | Tuesday, January 09, 2018 12:08 PM |
| To: | George Locke |
| Cc: | Deborra Sines Pancoe; Anthony Ciuca |
| Subject: | Fwd: David & Margaret Downs, 301 Runnymede Avenue, Jenkintown, PA 19046 |
| Attachments: | LETTER to Sean P. KilKenney, Esquire  (1-9-2018) (01113394xA68C5).pdf |

George, I am inclined to say no, we already had a meeting, thoughts?

Get Outlook for Android

**From: Peter S. Friedman, Esq. <PFriedman@fsalaw.com>**
**Sent: Tuesday, January 9, 2018 11:55:43 AM**
**To: Sean Kilkenny**
**Cc: George Locke**
**Subject: David & Margaret Downs, 301 Runnymede Avenue, Jenkintown, PA 19046**

Sean:

Please note my attached correspondence to you.  Please call me if you have any questions.

Hope all is well with you.

Peter

Peter S. Friedman, Esq.            Direct 215-690-3804 | Fax 215-635-7212

FRIEDMAN///SCHUMAN
Attorneys at Law

101 Greenwood Avenue, 5th Fl
Jenkintown, PA 19046
e-mail | v-card | bio | website

Please consider the environment before printing this e-mail.

CONFIDENTIALITY NOTICE:
The information contained in this electronic mail transmission (including any accompanying attachments) is intended solely for its authorized recipient(s) and may contain attorney/client privileged communications and confidential business information.  If you are not the intended recipient, you have received this transmission in error and are hereby notified that reading, disclosing, distributing, printing, copying or any other use of this electronic mail message is prohibited.  If you receive this electronic mail message by mistake, please immediately notify the sender and **info@fsalaw.com** and delete the original and all copies of this transmission (including any attachments) without reading, saving, copying or disclosing it.

IRS CIRCULAR 230 DISCLOSURE:
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

1